IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BOUNTS TECHNOLOGIES LTD., <br><br> Plaintiff, <br><br> v. <br><br> CONNECTIFY, INC. AND DOES 1-100, <br><br> Defendants. | CASE NO. 2:23-cv-890 <br><br> Judge Mia Roberts Perez |

**DECLARATION OF KEVIN CASEY, ESQ. IN SUPPORT OF CONNECTIFY'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS UNDER FEDERAL RULE OF CIVIL PROCEDURE 11**

I, Kevin Casey, do declare and state as follows:

1. I am a resident of the Commonwealth of Pennsylvania. I am admitted to, and am a member in good standing of, the bar of the Commonwealth of Pennsylvania.

2. I am a partner in the law firm of Stradley Ronon Stevens & Young, LLP, which represents the Defendant, Connectify, Inc., in this litigation.

3. I have personal knowledge of the facts stated in this Declaration.

4. I submit this Declaration in support of Connectify's Opening Brief in Support of its Motion for Sanctions Under Federal Rule of Civil Procedure 11.

5. Immediately after Bounts filed this lawsuit on March 8, 2023, I studied Bounts' U.S. Patent No. 9,258,309 (the "Patent-in-Suit"), learned about Connectify's products and the methods of using those products, and analyzed whether any of Connectify's products or the methods of using those products infringe any claim of the Patent-in-Suit. I determined that Connectify's products and methods do not infringe.

6. Attached to this Declaration as **Exhibit A** is a true and correct copy of a document titled "ANALYSIS OF US 9,258,309 B2" that I drafted with Kamran Emdadi, a patent attorney working with Connectify. I sent the document to Todd E. Zenger, Esq., counsel for Bounts, on March 17, 2023. The analysis reflected in that document confirms that Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law.

7. After I sent the document to Mr. Zenger, Mr. Emdadi and I conferred with Mr. Zenger on the same day: March 17, 2023. Mr. Emdadi and I explained further to Mr. Zenger why Connectify's products and the methods of using those products do not infringe any claim of the Patent-in-Suit.

8. To date, Mr. Zenger has not substantively responded to the document. Moreover, Mr. Zenger declined my invitation to re-confer about the analysis reflected in that document.

9. Attached to this Declaration as **Exhibit B** is a true and correct copy of a letter from me to Mr. Zenger dated July 12, 2023, providing notice under Fed. R. Civ. P. 11(c)(2), describing the specific conduct that violates Rule 11(b), and requesting the prompt withdrawal of Bounts' patent infringement claims. To date, Bounts has not withdrawn its claims, nor have I received a reply to my letter.

10. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: August 3, 2023

_Kevin R. Casey_
Kevin R. Casey

# EXHIBIT A

**CONFIDENTIAL INFORMATION**

ANALYSIS OF US 9,258,309 B2

Independent Claims 1, 13 and 19.

Claim 13 requires passing information between two sub-networks and is an apparatus with an additional feature (beyond claim 1) of a "<u>data store</u>" storing a "<u>driver</u>" which stores all sorts of information (routing table 1, routing table 2, network address 1, network address 2) and is less relevant and more narrowing than claim 1 discussed below.

Claim 19 requires a local area network with first and second sub-networks of the same type, a plurality of devices, etc., and is less relevant and more narrowing than claim 1 discussed below.

Claim 1 recites:

1. A method of operating a single network adapter, comprising **a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network**, the method comprising:

setting up **a first network address and routing table in the network interface card or module for use in the first sub-network**;

setting up **a second network address and routing table in the network interface card or module for use in the second sub-network**;

using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, **using the network addresses and routing tables**,

wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and

wherein the step of receiving data comprises **receiving a request from <u>a user</u> via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway**.

Highlighted above are the many limitations recited in claim 1 that are not met by any Connectify product or method. More specifically:

1) Connectify products and methods do not use **<u>two routing tables</u>** in a single network interface card NIC. No Connectify products or methods put any routing table in a NIC.
    a. Prosecution history of 9,258,309 is very specific about the need for two routing tables, the prosecution history states how no reference cited uses two routing tables.
        i. See page 10 of Response in response to Office Action dated January 27, 2015

            "Taking one specific example, none of Luo, Know or Wu...teach..."setting up a first and second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-

network. **Luo contains no teaching or suggestion of a single network interface card or module, let alone such a card or module with two network addresses and routing tables** and in communication with **a first and second sub-network** in the manner required by the claims. With regard to Knox, the paragraph highlighted by the Examiner (p.2, para 34) states merely that 'the mobile device 50 maintains a record of the address routing table…', which **refers only to a single routing table and is silent as to where it is stored**. Wu does not appear to make any reference at all to a network address and routing table, <u>let alone to two such tables stored in a single network interface card or module</u>."

"Additionally Luo fails to teach or suggest…using an aforesaid single network interface card or module to receive data for one sub-network and **re-transmit the data** to the other sub-network **using the network address and routing tables, receiving a request from a user**…verifying the user's access rights…"

2) No Connectify products or methods establish two subnetworks by setting up first and second network address **in** a single network interface card, this is a requirement for all the claims 1, 13 and 19
    a. Discussion on column 7, lines 9-19: subnetting required to create two sub-networks with different IP address allocations.

3) Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations):
    a. the IP controller (hotspot router)
    b. a device on the network (could send a packet from one device to another)
    c. outside the network (**does not require a second routing/translation table**)
        i. A remote third party device would route the packet to its destination via whatever IP translation and identification process is available on such devices. This external networking routing (Internet) is not part of another/second routing table needed or used by the hotspot router.

4) The final claim limitations require interaction with a <u>**"user."**</u> No Connectify products or methods meet these limitations; the products and methods are fully automated.

Finally, all claims of the '309 patent are invalid under Section 101 of the Patent Act. They are also likely invalid based on prior art.

# EXHIBIT B



Stradley Ronon Stevens & Young, LLP
Great Valley Corporate Center
30 Valley Stream Parkway
Malvern, PA 19355
Telephone 610.640.5800
Fax 610.640.1965
www.stradley.com

**Kevin R. Casey**
kcasey@stradley.com
610.640.5813

July 12, 2023

<u>**VIA Electronic Mail & Overnight Mail**</u>

Todd E. Zenger, Esq.
Duren IP
610 E. South Temple Street, Suite 300
Salt Lake City, Utah 84102
tzenger@durenip.com

    Re: **Bounts Technologies Ltd. v. Connectify, Inc., and Does 1-100, Case No. 2:23-cv-890 (E.D. Pa.) (asserting infringement of U.S. Patent 9,258,309 (the '309 Patent or the Patent-in-Suit))**

Dear Todd:

  Pursuant to Fed. R. Civ. P. 11, we write to request the prompt withdrawal of Bounts' patent infringement claims in view of the document titled "ANALYSIS OF US 9,258,309 B2" that was sent to you on March 17, 2023 (the "Analysis"), and our subsequent discussion. (We note that you have never substantively responded to the Analysis and declined our invitation to re-confer.) As explained further below, the Analysis confirms that Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law. *See* Fed. R. Civ. P. 11(b)(2). If Bounts refuses to withdraw the claims, we can only conclude that it does so for an improper purpose divorced from the objective merits of the claims. *See* Fed. R. Civ. P. 11(b)(1). We further strongly suspect that Bounts' claims are not based upon "an inquiry reasonable under the circumstances" as required by Rule 11(b).

  Still further, Rule 11(b)(3) requires that the factual contentions of a complaint have evidentiary support. Paragraph 9 of the complaint states: "Bounts sells and offers for sale devices and methods for operating a wireless access point for providing access to a network throughout the United States, including in the state of Pennsylvania." On information and belief, Bounts does not sell any products. Bounts is a United Kingdom "micro entity," whose balance sheet suggests that their only activity last year was paying a single 450 pound

bill that came due.  See Bounts tax documents at https://find-and-update.company-information.service.gov.uk/company/08758998/filing-history.

Bounts accuses Connectify of direct patent infringement, induced patent infringement, and willful patent infringement.  Connectify's Analysis and our discussion make abundantly clear that the accused Connectify Hotspot product and related methods cannot be a direct infringement of the claims of the asserted patent, either literally or under the doctrine of equivalents.  Absent direct infringement, induced infringement cannot exist.  Finally, there is absolutely no evidence that infringement was willful even were infringement arguably to exist.  In addition, all claims of the '309 Patent are invalid under Section 101 of the Patent Act, and no liability for infringement can lie if the patent is invalid.  Accordingly, it is readily apparent that Bounts' claims are without basis.

I.      Direct Infringement

The Patent-in-Suit issued on February 9, 2016, and is titled "Method And System For Operating A Wireless Access Point For Providing Access To A Network."  The Patent-in-Suit generally concerns a method for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus.  The Patent-in-Suit allegedly addresses the problem of connecting a wireless enabled device to a network via a wireless local area network.  (A wireless access point for providing access to the Internet is commonly known as a "hotspot.")

According to the Patent-in-Suit, this problem was addressed by International Patent Application Publication No. WO2006/021784.  The prior art system teaches two ports on a wireless access point controller of a wireless access point, each point having its own Internet Protocol (IP) address.  The Patent-in-Suit criticizes the solution of the prior art, explaining that a disadvantage of this arrangement is that each port requires a network adaptor, such as a network card.  Because commonly available personal computers and laptops are not conventionally provided with two network adaptors, the requirements for two network adaptors is an impediment to commissioning of conventional wireless access points as disclosed by the prior art.  Moreover, in such prior art hotspot arrangements, it is necessary to have a separate router (for internet access) such as a modem and a wireless access point.

The Patent-in-Suit describes the claimed invention as improving the system and method taught by WO2006/021784, allowing the use of a standard wireless router to provide a hotspot for guest access.  More specifically, a method is described in the Patent-in-Suit for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus.  The method comprises setting up a first network address and routing table in the network adapter for use in the first sub-network; setting up a second network address and routing table in the network adapter for use in the second sub-network; receiving data for one of the first and second sub networks, and re-transmitting the data to the other of the first and second sub-network, using the network addresses and routing tables.  More specifically, at column 7, lines 9-19, the '309 Patent teaches that subnetting is required to create two sub-networks with different IP address allocations:

> The hotspot controller 105 is configured to connect to two separate sub-networks, using a single network interface card (NIC). The first of these sub-networks is for traffic between the guest user's computers 119, 121, 123 on the

wireless network and the hotspot controller 105. The second sub-network is between the hotspot controller 105 and the internet 113. For example, the first sub-network may have IP addresses of the form 10.0.1.x, and the second sub-network may have IP addresses of the form 10.0.2.x. This division into two sub-networks is what allows the hotspot controller 105 to control the guest access to the internet.

The Patent-in-Suit resulted from Application No. 14/249,174 filed on April 9, 2014. In an Office Action dated January 27, 2015, the Patent Examiner rejected all of the claims in the application in light of the following prior art references: U.S. Patent No. 7,469,294 issued to Luo; U.S. Patent Application Publication No. 2007/0225019 filed by Knox; U.S. Patent Application Publication No. 2008/0069065 filed by Wu; and various secondary references. The Patent Examiner determined that all of the claims would have been obvious to one of ordinary skill in the art at the time the invention was made. On July 27, 2015, in response to the Office Action, the applicant argued that none of the Luo, Knox, or Wu prior art references suggest setting up a first and a second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-network. On page 10 of that response, the applicant was very specific about the need for two network addresses and not one routing table but "two such tables stored in a single network interface card or module" in communication with a first and second sub-network of a single network interface card or module, distinguishing the prior art references on the basis that no reference teaches or suggests those characteristics (underlined emphases added):

> Taking one specific example, none of Luo, Knox or Wu . . . teach . . . setting up a first and second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-network. <u>Luo contains no teaching or suggestion of a single network interface card or module, let alone such a card or module with two network addresses and routing tables and in communication with a first and second sub-network in the manner required by the claims</u>. With regard to <u>Knox</u>, the paragraph highlighted by the Examiner (p.2, para 34) states merely that 'the mobile device 50 maintains a record of the address routing table . . .', which <u>refers only to a single routing table and is silent as to where it is stored</u>. <u>Wu</u> does not appear to make any reference at all to a network address and routing table, <u>let alone to two such tables stored in a single network interface card or module</u>.
>
> Additionally Luo fails to teach or suggest . . . using an aforesaid single network interface card or module to receive data for one sub-network and <u>re-transmit the data</u> to the other sub-network <u>using the network address and routing tables, receiving a request from a user</u> . . . verifying the user's access rights . . . .

The Patent Examiner then allowed the application.

The prosecution history shows that the applicant was unequivocal in taking the position that the claimed invention is patentable over the prior art because the claimed card or module has two network addresses and two routing tables. According to the U.S. Court of

Appeals for the Federal Circuit, which hears all appeals in patent infringement suits, "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (reversing district court's infringement decision). Thus, the prosecution history shows that the applicant gave up an interpretation of the claim limitations that could include a method or an apparatus with a single network address or a single routing table in a single network interface card or module.

All patents conclude with a claim or set of claims particularly pointing out and distinctly claiming the subject matter which the patentee regards as the invention. The claims define the invention for the purpose of determining infringement. A claim will not cover or "read on" any product or method accused of infringement unless that product or method contains all of the limitations present in the claim (or an equivalent of a limitation within the meaning of the doctrine of equivalents). Thus, each limitation present in a claim constitutes a narrowing of the scope of that claim. A number of sources, including the specification of the patent, the prosecution history of the patent before the U.S. Patent and Trademark Office ("PTO"), and the prior art, help to give the claims their meaning and, hence, their scope.

Thus, the first step in a non-infringement analysis is to properly interpret the claims of the subject patent. After the limitations of the claims are interpreted, it is necessary to apply the second step of a non-infringement analysis and determine whether the claims cover the alleged infringer's product or method. If all of a claim's limitations are found literally, then there usually is "literal" infringement and the infringement analysis ends. The doctrine of equivalents allows a court to find infringement when an infringer steals the heart of an invention but avoids the literal language of a claim by making a minor change.

The '309 Patent recites three independent claims: claims 1, 13, and 19. Claim 13 requires passing information between two sub-networks and is an apparatus with an additional feature (beyond claim 1) of a "data store" storing a "driver" which stores all sorts of information (routing table 1, routing table 2, network address 1, network address 2) and is less relevant and more narrowing than claim 1 discussed below. Claim 19 requires a local area network with first and second sub-networks of the same type, a plurality of devices, etc., and is less relevant and more narrowing than claim 1 discussed below. Therefore, our analysis focuses on claim 1 (which is the only claim specifically asserted in Bounts' complaint). Claim 1 recites (underlined and bold emphases added):

> 1. A method of operating a single network adapter, comprising <u>a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network</u>, the method comprising:
>
> <u>setting up a first network address and routing table **in** the network interface card or module for use in the first sub-network</u>;
>
> <u>setting up a second network address and routing table **in** the network interface card or module for use in the second sub-network</u>;

>        using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, <u>using the network addresses and routing tables</u>,
>
>        wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and
>
>        <u>wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway</u>.

Highlighted above are the many limitations recited in claim 1 that are not met by any Connectify product or method. Literal infringement requires that the accused product or method embody <u>each</u> limitation of the asserted claim. *Southwall Tech., Inc. v. Cardinal I.G. Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). The absence of <u>any</u> limitation of the asserted claim defeats literal infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

First, Connectify products and methods do not use <u>two routing tables</u> in a single network interface card or module. No Connectify products or methods put <u>any</u> routing table in a network interface card or module. Second, no Connectify products or methods establish two subnetworks by setting up first and second network addresses <u>in</u> a single network interface card (which is a requirement for each of the independent claims 1, 13, and 19). Third, Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations): (i) the IP controller (hotspot router): (ii) a device on the network (could send a packet from one device to another); or (iii) a remote third party device that would route the packet to its destination via whatever IP translation and identification process is available on such devices (this external networking routing (internet) is not part of another/second routing table needed or used by the hotspot router). Finally, all of the claims require interaction with a "user." No Connectify products or methods meet that requirement or limitation; the products and methods are fully automated.

Although the accused Connectify Hotspot product and related methods avoid infringement if they fail to meet any one limitation recited in the claims of the '309 Patent, they fail to meet many of the recited limitations. Focus on the limitations that require two, separate network addresses and routing tables, each for use in a separate sub-network, in a single network interface card or module. The express language of the claims recite these limitations. And the structure of the claims could not be any more clear that there is a first network address and routing table in the network interface card or module for use in the first sub-network, and a second network address and routing table in the network interface card or module for use in the second sub-network.

The claimed concept of using two, separate sub-networks each having their own addresses and routing tables in a single network interface card or module is emphasized repeatedly in the patent specification. See, for example, column 7, lines 9-19, of the

specification quoted above and the Abstract and Summary of Invention (both of which characterize the invention as a method for operating a single network adapter for use on two different sub-networks of the same type and a corresponding apparatus). Likewise, during prosecution of the application that issued as the '309 Patent, it is clear that the Examiner allowed the patent after the applicant distinguished the claims from the prior art on the ground that no cited prior art reference teaches or suggest two network addresses and routing tables in communication with a first and second sub-network of a single network interface card or module.

Any theory concluding that the accused Connectify Hotspot product and related methods infringe is not colorable in view of the express language of the claims, the patent specification, and the prosecution history. Simply put, no Connectify products or methods put any routing table (let alone two routing tables) in a network interface card or module. Therefore, any theory of infringement must defy the express language of the claims and cannot satisfy Bounts' Rule 11 obligation. Such a theory of infringement would read out the claim language requirements that two, separate sub-networks each have their own addresses and routing tables in a single network interface card or module. Indeed, such a theory would remove the basis upon which the PTO issued the '309 Patent. The existing law of claim construction does not warrant a contrary claim construction.

To be clear, there is no good faith debate regarding a claim construction issue. Connectify's interpretation of the claim limitations is uniformly supported by the claim language, the patent specification, and the prosecution history. Therefore, any theory of patent infringement must be a blatant effort by Bounts to rewrite a claim after the fact to attempt to cover a device and related methods that do not come within any plausible reading of the claims as issued.

Furthermore, the existing law of the doctrine of equivalents does not warrant any theory that the claimed methods or apparatus could be equivalent to the accused Connectify Hotspot product and related methods, legally or factually. Any argument to the contrary is not colorable in view of the claims, the patent specification, the prosecution history, and Connectify's Analysis and our subsequent discussion. Even assuming that the doctrine of equivalents is applicable, which it is not, in view of such countervailing doctrines as claim vitiation and prosecution history estoppel, the idea that the differences are insubstantial is not credible. Because Connectify products and methods do not (i) use two routing tables in a single network interface card or module, (ii) put any routing table in a network interface card or module, (iii) establish two subnetworks by setting up first and second network addresses in a single network interface card, or (iv) require any interaction with a user, they are substantially different from the claimed methods and apparatus.

II.    Induced Infringement

Under 35 U.S.C. § 271(b), "Whoever actively induces infringement of a patent shall be liable as an infringer." The five elements of a claim of induced infringement are: "(1) with knowledge of or willful blindness to the existence of the patent-in-suit; (2) the defendant engaged in affirmative acts to induce (e.g., by persuading, leading, or influencing) a third party to perform acts that; (3) the defendant knew constituted infringement of the patent-in-suit (or was willfully blind to that fact); (4) with the specific intent to cause such infringement; and which (5) resulted in the third party directly infringing the patent-at-issue." *Bonutti Skeletal Innovations,*

*LLC v. Globus Medical Inc.*, 2015 WL 3755223 at *5 (E.D. Pa. 2015) (granting motion to dismiss claims of induced and willful infringement); *see also In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016).

Bounts has no evidence supporting any of the five elements. First, "[i]t is axiomatic that '[t]here can be no inducement . . . [of] infringement without an underlying act of direct infringement.'" *In re Bill of Lading*, 681 F.3d at 1333 (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted)). In this case, the complaint does not allege and completely fails to plead facts sufficient to plausibly show that a third party directly infringes the Patent-in-Suit.

Second, Connectify had no knowledge that the allegedly induced acts constitute patent infringement or the specific intent to cause the alleged direct infringement. "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Moreover, "the intent requirement for inducement requires more than just the intent to cause the acts that produce direct infringement, . . . the inducer must have an affirmative intent to cause direct infringement. . . . To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part); *Compound Photonics, LTD v. Sony Corp.*, 2013 WL 4826585 at p. 5 (E.D. Tex. 2013), report and recommendation adopted, No. 6:11-cv-00552 (E.D. Texas Jul. 18, 2013) ("[T]he knowledge requirement for inducement refers to the inducer's knowledge of the induced third party's infringing acts, not knowledge of an inducer's own inducing conduct"). As in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223, Bounts' inducement claim must fail for at least this reason.

Connectify did not even remotely have the intent necessary for an induced infringement claim. Indeed, the complaint does not allege and completely fails to plead facts sufficient to plausibly show that Connectify had knowledge of the Patent-in-Suit before the complaint was filed. Nor could the complaint truthfully so allege because, in fact, Connectify was completely unaware of either the Patent-in-Suit or Bounts' allegations of infringement before the lawsuit was filed. Nor has Bounts adequately alleged (nor could it) that Connectify knew any third party was engaged in activity that constituted a direct infringement. These facts were dispositive in *Progme Corp. v. Comcast Cable Communications LLC*, 2017 WL 5070723 at *8 (E.D. Pa. 2017), and should be dispositive in this case.

Third, Connectify has not taken any action to induce direct infringement by a third party. "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med.*, 471 F.3d at 1306; *Power Integrations*, 843 F.3d at 1332 ("'[T]o prevail under a theory of indirect infringement, [plaintiff] must first prove that the defendants' actions led to direct infringement of the [patent-in-suit]'") (citation omitted). In this case, the complaint does not allege (nor could it) and completely fails to plead facts regarding Connectify's specific intent. Bounts cites no facts that lead to the plausible inference that Connectify intended for a third party to infringe the claims of the Patent-in-Suit. For this reason, too, and as in *Progme Corp.*, 2017 WL 5070723 at *9, and in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223 at *9, Bounts' inducement claim must fail.

III.     Willful Infringement

Bounts seeks enhanced damages for willful infringement under 35 U.S.C. § 284. Under Section 284, a court may "increase the damages up to three times the amount found or assessed." Willful infringement is reserved for "egregious infringement behavior" that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or -- indeed -- characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016). The Federal Circuit has clarified that "it is the circumstances [of the case] that transform simple 'intentional or knowing' infringement into egregious, sanctionable behavior, and that makes all the difference." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019). Therefore, to succeed on its willful infringement claim, Bounts must allege that Connectify engaged in egregious misconduct, which is well beyond an allegation of knowing and continued infringement. A willful infringement allegation must be supported by facts that the accused infringer both: (1) knew about the asserted patent before the lawsuit was filed; and (2) acted in a subjectively reckless manner concerning potential infringement which is beyond an allegation of knowing and continued infringement. These facts do not exist here.

In fact, Connectify was completely unaware of the Patent-in-Suit before the lawsuit was filed and had no reason to believe the Patent-in-Suit existed. Connectify has sold the accused product, "Connectify Hotspot," for fourteen years and the Patent-in-Suit issued in 2016. The seven years of sales by Connectify without notice from Bounts of the Patent-in-Suit certainly justified Connectify in subjectively believing there was a high probability the Patent-in-Suit did NOT exist.

Nor has Connectify acted in a subjectively reckless manner concerning potential infringement. In fact, immediately after learning of the lawsuit, Connectify analyzed the claims of the Patent-in-Suit, determined that its products and methods did not infringe, and explained its analysis and determination to counsel for Bounts. Such conduct is the opposite of acting with egregious intent or recklessness.

Indeed, Bounts' willful infringement allegations are substantially thinner than other willful infringement allegations that have been dismissed in the U.S. District Court for the Eastern District of Pennsylvania as insufficient. For example, in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223 at *11-12, the court dismissed Bonutti's willful infringement claims even though Globus had listed Bonutti's asserted patent in connection with the prosecution of its own patent application. Accordingly, Bounts' willful infringement claims are legally insufficient.

On March 17, 2023, Connectify put Bounts on notice of the flaws in its direct infringement claims. Bounts acquiesced until serving this lawsuit for what appears to be an improper business motivation divorced from any objective assessment of the merits. There is no credible basis to maintain the patent infringement claims. Particularly given the lack of commercial activity of Bounts, the improper motive would be readily apparent if Bounts were to maintain these expensive but frivolous claims.

We also strongly suspect that Bounts' claims are not based upon "an inquiry reasonable under the circumstances" as required by Fed. R. Civ. P. 11(b). The decisions of the Federal Circuit require, under Rule 11, that a party reverse engineer, or at least examine closely, an accused product before filing a patent infringement complaint. Failure to make

appropriate investigation before filing a patent infringement suit may also trigger 35 U.S.C. § 285 (attorney fees may be awarded in "exceptional cases"). Note that the 1993 amendments to Rule 11 rejected the "paper-as-a-whole" approach; the current version of the rule makes clear that sanctions may be based on a single invalid legal or factual theory (e.g., assertion of one patent claim) even if other asserted theories are valid (e.g., assertion of other claims). *See Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066 (Fed. Cir. 2002) (citing G. Vairo, "Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures," 4-117 (2d ed. 1990 & Supp. 1995)).

In *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000), the Federal Circuit affirmed the district court's decision to impose a $97,825 sanction on attorneys representing a declaratory judgment defendant, based on lack of reasonable inquiry before filing infringement counterclaims. The defendant merely reviewed the plaintiff's advertising and statements made to customers but never had physical access to the accused machines. The Federal Circuit stated:

> Before filing counterclaims of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11. . . . In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

*Id.* at 986.

In summary, Bounts cannot maintain its patent infringement claims under existing law or any non-frivolous argument for new law. Accordingly, we request that Bounts withdraw its patent infringement claims with prejudice by August 2, 2023. If Bounts refuses to withdraw the patent infringement claims, we will initiate Rule 11 proceedings and seek all appropriate remedies, including the recovery of our fees to bring the Rule 11 motion as well as costs and fees to defend the patent infringement claims in the interim.

Sincerely,

Kevin R. Casey

KRC:ml

cc: Patrick Kingsley, Esq.; Samantha Kats, Esq.; and Ryan E. Borneman, Esq. (via e-mail only)