EXHIBIT 3



**Stradley Ronon Stevens & Young, LLP**

Great Valley Corporate Center

30 Valley Stream Parkway

Malvern, PA 19355

Telephone  610.640.5800

Fax  610.640.1965

www.stradley.com



**Kevin R. Casey**
kcasey@stradley.com
610.640.5813

August 22, 2023

<u>**VIA Electronic Mail & Overnight Mail**</u>

Todd E. Zenger, Esq.                    Ryan E. Borneman, Esq.
Duren IP                                DUANE MORRIS LLP
610 E. South Temple Street, Suite 300   30 South 17th Street
Salt Lake City, Utah 84102              Philadelphia, PA 19103-4196
tzenger@durenip.com                     reborneman@duanemorris.com

> Re:    **Bounts Technologies Ltd. v. Connectify, Inc., and Does 1-100,
>        Case No. 2:23-cv-890 (E.D. Pa.) (asserting infringement of
>        U.S. Patent 9,258,309 (the '309 Patent or the Patent-in-Suit))**

Dear Todd and Ryan:

Pursuant to Fed. R. Civ. P. 11(c)(2), enclosed is a Motion for Rule 11 Sanctions that we intend to file if Bounts does not promptly withdrawal its patent infringement claims.  If Bounts refuses to withdraw its claims, we can only conclude that it does so for an improper purpose divorced from the objective merits of the claims.  *See* Fed. R. Civ. P. 11(b)(1).  We further strongly suspect that Bounts' claims are not based upon "an inquiry reasonable under the circumstances" as required by Rule 11(b).

In summary, Bounts cannot maintain its patent infringement claims under existing law or any non-frivolous argument for new law.  Accordingly, we request that Bounts withdraw its patent infringement claims with prejudice within 21 days, by <u>September 12, 2023</u>.  If Bounts refuses to withdraw the patent infringement claims by September 12, 2023, we will file the enclosed Motion for Rule 11 Sanctions and seek all appropriate remedies, including the recovery of our fees to bring the Rule 11 motion as well as costs and fees to defend the patent infringement claims in the interim.

August 22, 2023
Page 2

       If you have any questions or would like to discuss, please contact me.

                    Sincerely,

                    Kevin R. Casey

KRC:sbk

Enclosures

cc:  Patrick Kingsley, Esq. (via e-mail only)
     Samantha Kats, Esq. (via e-mail only)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BOUNTS TECHNOLOGIES LTD., | : |
| Plaintiff, | : CASE NO. 2:23-cv-890 |
| v. | : Judge Mia Roberts Perez |
| CONNECTIFY, INC. AND DOES 1-100, | : |
| Defendants. | : |

**MOTION OF DEFENDANT, CONNECTIFY, INC., FOR RULE 11 SANCTIONS**
**AGAINST PLAINTIFF AND ITS COUNSEL**

Defendant, Connectify, Inc. ("Connectify") hereby moves for an order imposing

sanctions against Plaintiff, Bounts Technologies Ltd. ("Plaintiff"), and its counsel, Todd E.

Zenger, Esquire and Ryan E. Borneman, Esquire, pursuant to Rule 11 of the Federal Rules of

Civil Procedure and incorporates herein by reference the accompanying Brief and Exhibits.

Respectfully submitted,

Stradley Ronon Stevens & Young, LLP

_____
Kevin R. Casey, Esq. (Pa. ID No. 58083)
Patrick R. Kingsley, Esq. (Pa. ID No. 62915)
Samantha B. Kats, Esq. (Pa. ID No. 316178)
30 Valley Stream Parkway
Malvern, PA 19355
610-640-5800
Kcasey@stradley.com
Pkingsley@stradley.com
Skats@stradley.com

*Attorneys for Defendant, Connectify, Inc.*

Dated:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BOUNTS TECHNOLOGIES LTD., | : | |
| | : | |
| Plaintiff, | : | CASE NO. 2:23-cv-890 |
| | : | |
| v. | : | Judge Mia Roberts Perez |
| | : | |
| CONNECTIFY, INC. AND DOES 1-100, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CONNECTIFY'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR SANCTIONS UNDER FEDERAL RULE OF CIVIL PROCEDURE 11**

Defendant, Connectify, Inc. ("Connectify") submits this brief in support of its motion for Rule 11 sanctions against Plaintiff, Bounts Technologies Ltd. ("Plaintiff"), and its counsel, Todd E. Zenger, Esquire and Ryan E. Borneman, Esquire for their baseless assertion of patent infringement against Connectify.

## I.    INTRODUCTION & FACTUAL BACKGROUND

On March 8, 2023, Bounts filed, but did not serve, its Complaint accusing Connectify of direct infringement, induced infringement, and willful infringement of U.S. Patent No. 9,258,309 (the "Patent-in-Suit" or "the '309 Patent"). On March 17, 2023, Kevin Casey, outside counsel for Connectify, and Kamran Emdadi, Connectify's inside patent attorney, forwarded to Bounts' counsel Mr. Zenger a document summarizing the operation of Connectify's products and methods and explaining why they do not infringe the claims of the patent (the "March 17, 2023 Analysis"). A copy of the March 17, 2023 Analysis is attached to the Declaration of Kevin Casey ("Casey Declaration") as **Exhibit A**. Later that same day, the three attorneys conferred, with counsel for Connectify providing further explanation of why Connectify's products and the methods of using

those products do not infringe any claim of the Patent-in-Suit. Casey Declaration at ¶ 7. To date, Mr. Zenger has not substantively responded to the March 17, 2023 Analysis. *Id.* at ¶ 8. Moreover, Mr. Zenger declined Mr. Casey's invitation to re-confer about the analysis reflected in the March 17, 2023 Analysis. *Id.* As a result, Connectify was forced to incur significant time and expense in connection with filing a motion to dismiss Bounts' Complaint on August 3, 2023. [1]

Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law. *See* Fed. R. Civ. P. 11(b)(2). Rule 11(b)(3) requires that the factual contentions of a complaint have evidentiary support.

Bounts accuses Connectify of direct patent infringement, induced patent infringement, and willful patent infringement. Connectify's March 17, 2023 Analysis makes abundantly clear that the accused Connectify Hotspot product and related methods cannot be a direct infringement of the claims of the asserted patent, either literally or under the doctrine of equivalents. Absent direct infringement, induced infringement cannot exist. Finally, there is absolutely no evidence that infringement was willful even were infringement arguably to exist. In addition, all claims of the '309 Patent are invalid under Section 101 of the Patent Act, and no liability for infringement can lie if the patent is invalid. Accordingly, it is readily apparent that Bounts' claims are without basis.

A.    **Direct Infringement**

The Patent-in-Suit issued on February 9, 2016, and is titled "Method And System For Operating A Wireless Access Point For Providing Access To A Network." The Patent-in-Suit

---

[1] Despite having filed an Opposition to the Motion to Dismiss on August 17, 2023 [Dkt. no. 13], Bounts subsequently filed an Amended Complaint on August 21, 2023. *See* Am. Compl. [Dkt. no. 15]. Notably, Plaintiff's Amended Complaint fails to cure most of the pleading defects in its original Complaint that were detailed in Connectify's Motion to Dismiss [Dkt. no. 10] and initial Motion for Rule 11 Sanctions filed on August 3, 2023 [Dkt. no. 11].

generally concerns a method for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus. The Patent-in-Suit allegedly addresses the problem of connecting a wireless enabled device to a network via a wireless local area network. A wireless access point for providing access to the Internet is commonly known as a "hotspot."

According to the Patent-in-Suit, this problem was addressed by International Patent Application Publication No. WO2006/021784. The prior art system teaches two ports on a wireless access point controller of a wireless access point, each point having its own Internet Protocol (IP) address. The Patent-in-Suit criticizes the solution of the prior art, explaining that a disadvantage of this arrangement is that each port requires a network adaptor, such as a network card. Because commonly available personal computers and laptops are not conventionally provided with two network adaptors, the requirements for two network adaptors are an impediment to commissioning of conventional wireless access points as disclosed by the prior art. Moreover, in such prior art hotspot arrangements, it is necessary to have a separate router (for internet access) such as a modem and a wireless access point.

The Patent-in-Suit describes the claimed invention as improving the system and method taught by WO2006/021784, allowing the use of a standard wireless router to provide a hotspot for guest access. More specifically, a method is described in the Patent-in-Suit for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus. The method comprises setting up a first network address and routing table in the network adapter for use in the first sub-network; setting up a second network address and routing table in the network adapter for use in the second sub-network; receiving data for one of the first and second sub networks, and re-transmitting the data to the other of the first and second sub-network, using the network addresses and routing tables. More

3

specifically, at column 7, lines 9-19, the '309 Patent teaches that subnetting is required to create two sub-networks with different IP address allocations.  *See* Ex. 1 to Compl.

The Patent-in-Suit resulted from Application No. 14/249,174 filed on April 9, 2014.  In an Office Action dated January 27, 2015, the Patent Examiner rejected all of the claims in the application in light of the following prior art references: U.S. Patent No. 7,469,294 issued to Luo; U.S. Patent Application Publication No. 2007/0225019 filed by Knox; U.S. Patent Application Publication No. 2008/0069065 filed by Wu; and various secondary references.  *See* **Exhibit 1** hereto.  The Patent Examiner determined that all of the claims would have been obvious to one of ordinary skill in the art at the time the invention was made.  *See id.*  On July 27, 2015, in response to the Office Action, the applicant argued that none of the Luo, Knox, or Wu prior art references suggest setting up a first and a second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-network.  A true and correct copy of the July 27, 2015 response to the Office Action is attached hereto as **Exhibit 2**.  The applicant was very specific in its response about the need for two network addresses and not one routing table but "two such tables stored in a single network interface card or module" in communication with a first and second sub-network of a single network interface card or module, distinguishing the prior art references on the basis that no reference teaches or suggests those characteristics.  *See id.* at p. 10.  The Patent Examiner then allowed the application.

The prosecution history shows that the applicant was unequivocal in taking the position that the claimed invention is patentable over the prior art because the claimed module has two network addresses and two routing tables.  *Id.*[2]  Thus, the prosecution history shows that the

---

[2] According to the U.S. Court of Appeals for the Federal Circuit, which hears all appeals in patent infringement suits, "the prosecution history (or file wrapper) limits the interpretation

4

applicant gave up an interpretation of the claim limitations that could include a method or an apparatus with a single network address or a single routing table in a single network interface card or module.

All patents conclude with a claim or set of claims particularly pointing out and distinctly claiming the subject matter which the patentee regards as the invention.  The claims define the invention for the purpose of determining infringement.  A claim will not cover or "read on" any product or method accused of infringement unless that product or method contains all of the limitations present in the claim (or an equivalent of a limitation within the meaning of the doctrine of equivalents).  Thus, each limitation present in a claim constitutes a narrowing of the scope of that claim.  A number of sources, including the specification of the patent, the prosecution history of the patent before the U.S. Patent and Trademark Office ("PTO"), and the prior art, help to give the claims their meaning and, hence, their scope.

Thus, the first step in a non-infringement analysis is to properly interpret the claims of the subject patent.  After the limitations of the claims are interpreted, it is necessary to apply the second step of a non-infringement analysis and determine whether the claims cover the alleged infringer's product or method.  The doctrine of equivalents allows a court to find infringement when an infringer steals the heart of an invention but avoids the literal language of a claim by making a minor change.

The '309 Patent recites three independent claims: claims 1, 13, and 19.  *See* Ex. 1 to Compl.  Claim 13 requires passing information between two sub-networks and is an apparatus with an additional feature (beyond claim 1) of a "data store" storing a "driver" which stores all

---

of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (reversing district court's infringement decision).

sorts of information (routing table 1, routing table 2, network address 1, network address 2) and is less relevant and more narrowing than claim 1 discussed below. Claim 19 requires a local area network with first and second sub-networks of the same type, a plurality of devices, etc., and is less relevant and more narrowing than claim 1 discussed below. Therefore, our analysis focuses on claim 1 (which is the only claim specifically asserted in Bounts' Amended Complaint). Claim 1 recites (underlined and bold emphases added):

> 1. A method of operating a single network adapter, comprising <u>a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network</u>, the method comprising:
>
> <u>setting up a first network address and routing table **in** the network interface card or module for use in the first sub-network;</u>
>
> <u>setting up a second network address and routing table **in** the network interface card or module for use in the second sub-network;</u>
>
> using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, <u>using the network addresses and routing tables,</u>
>
> wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and
>
> <u>wherein the step of receiving data comprises receiving a request from **a user** via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway.</u>

Ex. 1 to Am. Compl. at columns 8 and 9. Highlighted above are the many limitations recited in claim 1 that are not met by *any* Connectify product or method. Literal infringement requires that the accused product or method embody <u>each</u> limitation of the asserted claim. *Southwall Tech., Inc. v. Cardinal I.G. Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). The absence of <u>any</u> limitation of the asserted claim defeats literal infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

First, Connectify products and methods do not use two routing tables in a single network interface card or module. *See* Declaration of Kamran Emdadi ("Emdadi Declaration") at ¶ 8. No Connectify products or methods put any routing table in a network interface card or module. *Id.* Second, no Connectify products or methods establish two subnetworks by setting up first and second network addresses in a single network interface card (which is a requirement for each of the independent claims 1, 13, and 19). *Id.* at ¶ 9. Third, Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations): (i) the IP controller (hotspot router): (ii) a device on the network (could send a packet from one device to another); or (iii) a remote third party device that would route the packet to its destination via whatever IP translation and identification process is available on such devices (this external networking routing (internet) is not part of another/second routing table needed or used by the hotspot router). *Id.* at ¶ 10. Finally, all of the claims require interaction with a "user" unlike any Connectify products or methods which are fully automated. *Id.* at ¶ 11.

Although the accused Connectify Hotspot product and related methods avoid infringement if they fail to meet any one limitation recited in the claims of the '309 Patent, they fail to meet many of the recited limitations. Focus on the limitations that require two, separate network addresses and routing tables, each for use in a separate sub-network, in a single network interface card or module. The express language of the claims recite these limitations. The claimed concept of using two, separate sub-networks each having their own addresses and routing tables in a single network interface card or module is emphasized repeatedly in the patent specification. *See, e.g.*, Ex. 1 to Am. Compl. at column 7, lines 9-19 (characterizing the invention as a method for operating a single network adapter for use on two

different sub-networks of the same type and a corresponding apparatus). Likewise, during prosecution of the application, the Examiner allowed the '309 Patent only after the applicant distinguished the claims from the prior art on the ground that no cited prior art reference teaches or suggests two network addresses and routing tables in communication with a first and second sub-network of a single network interface card or module.

Any theory concluding that the accused Connectify Hotspot product and related methods infringe is not colorable in view of the express language of the claims, the patent specification, and the prosecution history. Simply put, no Connectify products or methods put any routing table (let alone two routing tables) in a network interface card or module. Therefore, any theory of infringement must defy the express language of the claims and cannot satisfy Bounts' Rule 11 obligation. Such a theory of infringement would read out the claim language requirements that two, separate sub-networks each have their own addresses and routing tables in a single network interface card or module. Indeed, such a theory would remove the basis upon which the PTO issued the '309 Patent.

Furthermore, the existing law of the doctrine of equivalents does not warrant any theory that the claimed methods or apparatus could be equivalent to the accused Connectify Hotspot product and related methods, legally or factually. Even assuming that the doctrine of equivalents is applicable, which it is not, in view of such countervailing doctrines as claim vitiation and prosecution history estoppel, the idea that the differences are insubstantial is not credible. Because Connectify products and methods do not (i) use two routing tables in a single network interface card or module, (ii) put any routing table in a network interface card or module, (iii) establish two subnetworks by setting up first and second network addresses in a

single network interface card, or (iv) require any interaction with a user, they are substantially different from the claimed methods and apparatus.

### B.  <u>Induced Infringement</u>

Under 35 U.S.C. § 271(b), "Whoever actively induces infringement of a patent shall be liable as an infringer."  The five elements of a claim of induced infringement are: "(1) with knowledge of or willful blindness to the existence of the patent-in-suit; (2) the defendant engaged in affirmative acts to induce (e.g., by persuading, leading, or influencing) a third party to perform acts that; (3) the defendant knew constituted infringement of the patent-in-suit (or was willfully blind to that fact); (4) with the specific intent to cause such infringement; and which (5) resulted in the third party directly infringing the patent-at-issue." *Bonutti Skeletal Innovations, LLC v. Globus Medical Inc*., 2015 WL 3755223 at \*5 (E.D. Pa. 2015); *see also In re Bill of Lading Transmission & Processing Sys. Patent Litig*., 681 F.3d 1323, 1339 (Fed. Cir. 2012); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016).  Paragraph 15 of the Amended Complaint simply restates those elements. Bounts has no evidence supporting any of the five elements.  First, "[i]t is axiomatic that '[t]here can be no inducement . . . [of] infringement without an underlying act of direct infringement.'" *In re Bill of Lading*, 681 F.3d at 1333 (citing *Linear Tech. Corp. v. Impala Linear Corp*., 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted)).  In this case, the Amended Complaint does not allege and completely fails to plead facts sufficient to plausibly show that a third party directly infringes the Patent-in-Suit.

Second, Connectify had no knowledge that the allegedly induced acts constitute patent infringement or the specific intent to cause the alleged direct infringement. *See* Emdadi Declaration at ¶ 13.  "[I]nduced infringement under § 271(b) requires knowledge that the

induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Moreover, "the intent requirement for inducement requires more than just the intent to cause the acts that produce direct infringement, . . . the inducer must have an affirmative intent to cause direct infringement. . . . To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part); *Compound Photonics, LTD v. Sony Corp.*, 2013 WL 4826585 at p. 5 (E.D. Tex. 2013), report and recommendation adopted, No. 6:11-cv-00552 (E.D. Texas Jul. 18, 2013) ("[T]he knowledge requirement for inducement refers to the inducer's knowledge of the induced third party's infringing acts, not knowledge of an inducer's own inducing conduct"). As in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223, Bounts' inducement claim must fail for at least this reason.

Connectify did not even remotely have the intent necessary for an induced infringement claim. Indeed, the Amended Complaint does not allege and completely fails to plead facts sufficient to plausibly show that Connectify had knowledge of the Patent-in-Suit before the original complaint was filed. Nor could Bounts truthfully so allege because, in fact, Connectify was completely unaware of either the Patent-in-Suit or Bounts' allegations of infringement before the lawsuit was filed. *See* Emdadi Declaration at ¶ 12. Nor has Bounts adequately alleged (nor could it) that Connectify knew any third party was engaged in activity that constituted a direct infringement. These facts were dispositive in *Progme Corp. v. Comcast Cable Commc'ns LLC*, 2017 WL 5070723 at *8 (E.D. Pa. 2017), and should be dispositive in this case.

Third, Connectify has not taken any action to induce direct infringement by a third party. *See* Emdadi Declaration at ¶ 13. "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med.*, 471 F.3d at 1306; *Power Integrations*, 843 F.3d at 1332 ("'[T]o prevail . . . [plaintiff] must first prove that the defendants' actions led to direct infringement of the [patent-in-suit]'") (citation omitted). In this case, the Amended Complaint does not allege (nor could it) and completely fails to plead facts regarding Connectify's specific intent. Bounts cites no facts that lead to the plausible inference that Connectify intended for a third party to infringe the claims of the Patent-in-Suit. For this reason, too, and as in *Progme Corp.* and in *Bonutti Skeletal Innovations, LLC*, Bounts' inducement claim must fail.

## C.    Willful Infringement

Bounts seeks enhanced damages for willful infringement under 35 U.S.C. § 284. Under Section 284, a court may "increase the damages up to three times the amount found or assessed." Willful infringement is reserved for "egregious infringement behavior" that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or -- indeed -- characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016). The Federal Circuit has clarified that "it is the circumstances [of the case] that transform simple 'intentional or knowing' infringement into egregious, sanctionable behavior, and that makes all the difference." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019). Therefore, to succeed on its willful infringement claim, Bounts must allege that Connectify engaged in egregious misconduct, which is well beyond an allegation of knowing and continued infringement. These facts do not exist here.

In fact, Connectify was completely unaware of the Patent-in-Suit before the lawsuit was filed and had no reason to believe the Patent-in-Suit existed. *See* Emdadi Declaration at ¶ 12. Connectify has sold the accused product, "Connectify Hotspot," for fourteen years and the Patent-in-Suit issued in 2016. *Id.* at ¶ 14. Nor has Connectify acted in a subjectively reckless manner concerning potential infringement. In fact, immediately after learning of the lawsuit, Connectify analyzed the claims of the Patent-in-Suit, determined that its products and methods did not infringe, and explained its analysis and determination to counsel for Bounts. *See* Ex. A to Casey Declaration. Such conduct is the opposite of acting with egregious intent or recklessness. Accordingly, Bounts' willful infringement claims are legally insufficient.

On March 17, 2023, Connectify put Bounts on notice of the flaws in its infringement claims. Bounts served this lawsuit for what appears to be an improper business motivation divorced from any objective assessment of the merits. There is no credible basis to maintain the patent infringement claims. Particularly given Bounts' lack of commercial activity, the improper motive is readily apparent by Bounts maintaining its expensive but frivolous claims.

Federal Rule of Civil Procedure 11(b) requires that claims be based upon "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b).[3] The decisions of the Federal Circuit require, under Rule 11, that a party reverse engineer, or at least examine closely, an accused product before filing a patent infringement complaint. Failure to make appropriate investigation before filing a patent infringement suit may also trigger 35 U.S.C. § 285 (attorney

---

[3] The 1993 amendments to Rule 11 rejected the "paper-as-a-whole" approach; the current version of the rule makes clear that sanctions may be based on a single invalid legal or factual theory (e.g., assertion of one patent claim) even if other asserted theories are valid (e.g., assertion of other claims). *See Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066 (Fed. Cir. 2002) (citing G. Vairo, "Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures," 4-117 (2d ed. 1990 & Supp. 1995)).

fees may be awarded in "exceptional cases").  In *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000), the Federal Circuit affirmed the district court's decision to impose a $97,825 sanction on attorneys representing a declaratory judgment defendant, based on lack of reasonable inquiry before filing infringement counterclaims.  The defendant merely reviewed the plaintiff's advertising and statements made to customers but never had physical access to the accused machines. *Id.* at 986.  The same result is warranted here.

As required under Rule 11(c)(2), a copy of this Motion was served upon Plaintiff through its counsel of record on August 22, 2023, which put Plaintiff on notice of Connectify's intent to file this motion and the basis for it more than twenty-one (21) days prior to its filing.  *See* **Exhibit 3** hereto.  Nonetheless, the fatal flaws identified herein and detailed in Connectify's Motion to Dismiss and initial Motion for Rule 11 Sanctions, filed on August 3, 2023, were not corrected, and thus Rule 11 sanctions are even more appropriate now than they might have been before Bounts chose to file its Amended Complaint.

## II.    **ARGUMENT**

### A.    **Applicable Law**

Rule 11 requires "[e]very pleading, written motion, and other paper" to be signed "by at least one attorney of record."  Fed. R. Civ. P. 11(a).  By "signing, filing, submitting, or later advocating" such a paper, the attorney "certifies that to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that:

(1)    it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and

(3)     the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(1)-(3).  When applying Rule 11 in patent cases, the regional law of the circuit applies.  *Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002).  In the Third Circuit, conduct violates Rule 11 if it fails to be "objectively reasonable under the circumstances." *Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 297 (3d Cir. 2010). Frivolous assertions of patent infringement warrant sanctions.  *See, e.g., ICU Med., Inc. v. Alaris Med. Sys.*, No. SA CV 04-689, 2007 U.S. Dist. LEXIS 34467, *10-11 (C.D. Cal. Apr. 16, 2007), *aff'd*, 558 F.3d 1368 (Fed. Cir. 2009); *Judin v. United States*, 110 F.3d 780, 784-85 (Fed. Cir. 1997).

Rule 11 obligations continue to apply after signing or filing a paper. "[S]anctions are proper when, *inter alia*, a party 'insists upon a position after it is no longer tenable.'"  *Balthazar v. Atl. City Med. Ctr.*, 137 Fed. Appx. 482, 490 (3d Cir. 2005).  "A litigant's obligations with respect to the contents of [papers filed with the court] are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 493 (D. Del. 1998) (quoting the 1993 Advisory Committee Notes to Rule 11).  Continued litigation of untenable patent infringement claims warrants sanctions.  *See, e.g., Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 706 F. Supp. 2d 713, 736 (N.D. Tex. 2010) (imposing Rule 11 sanctions where, among other things, party pursued its infringement claims after it became clear those claims had no merit).

### B.     <u>Rule 11 Sanctions Are Appropriate</u>

The standard set forth in the above cases has been more than met here.  For the foregoing

reasons, Connectify requests sanctions against Bounts and its counsel.[4]  Connectify requests its

attorneys' fees and costs in bringing this Rule 11 motion and in defending the baseless patent

infringement claims, including fees and costs related to its motions to dismiss. *See* Fed. R. Civ. P.

11(c)(2) and (c)(4); *see also Phonometrics, Inc. v. Econ. Inns. of Am.*, 349 F.3d 1356 (Fed. Cir.

2003) (affirming order awarding defendant of attorneys' fees and costs under Rule 11 where

plaintiff pursued its claim of patent infringement in the face of several Federal Circuit decisions

that made clear plaintiff's claim was "untenable").

Finally, Connectify requests dismissal with prejudice of Bounts' Amended Complaint to

prevent further waste of resources on patent infringement claims that can only be considered

frivolous.  *See, e.g.*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278, 1281 (3rd Cir. 1994)

(affirming district court's dismissal of complaint); *Carman v. Treat*, 7 F.3d 1379, 1382 (8th Cir.

1993) (affirming dismissal of baseless action pursuant to Rule 11).  Indeed, Bounts had notice of

the flaws in its infringement claims since at least March 17, 2023, and had the opportunity to

withdraw it claims, but it chose not to do so.  In fact, Bounts has exacerbated its egregious behavior

by filing its Amended Complaint.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Connectify respectfully requests that this Court grant its Motion

for Rule 11 Sanctions and enter an Order in the form attached hereto.  Connectify further requests

the opportunity to submit an itemization of the attorneys' fees and costs incurred in connection

with this action.

---

[4]  Rule 11 authorizes the Court to impose various sanctions against Bounts or its attorneys.  *See* Fed. R. Civ. P. 11(c)(1) (where Rule 11(b) has been violated, "the court may impose an appropriate sanction on any attorney, law firm or party that violated the rule or is responsible for the violation").

Dated:  September__, 2023                    Respectfully submitted,

                                             Stradley Ronon Stevens & Young, LLP

                                             _____
                                             Kevin R. Casey, Esq. (Pa. Attorney No. 58083)
                                             Patrick R. Kingsley, Esq. (Pa. Attorney No. 62915)
                                             Samantha B. Kats, Esq. (Pa. Attorney No. 316178)
                                             30 Valley Stream Parkway
                                             Malvern, PA 19355
                                             610-640-5800
                                             Kcasey@stradley.com
                                             Pkingsley@stradley.com
                                             Skats@stradley.com

                                             *Attorneys for Defendant, Connectify, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BOUNTS TECHNOLOGIES LTD., | : |
| Plaintiff, | : |
| | : CASE NO. 2:23-cv-890 |
| v. | : |
| | : Judge Mia Roberts Perez |
| CONNECTIFY, INC. AND DOES 1-100, | : |
| Defendants. | : |

**ORDER**

AND NOW, on this ____day of _____, 2023, upon consideration of the

Motion of Defendant, Connectify, Inc. ("Connectify"), for Rule 11 Sanctions against Plaintiff

and its counsel of record, and any response thereto, it is hereby **ORDERED, ADJUDGED**, and

**DECREED** that Connectify's Motion is **GRANTED**.

It is further **ORDERED** that the Amended Complaint is **DISMISSED WITH**

**PREJUDICE**, and within twenty (20) days of the entry of this Order, Connectify shall submit an

itemization of costs and fees incurred in connection with this action, which reasonable fees shall

be paid by counsel of record for Plaintiff.

BY THE COURT:

_____

Mia Roberts Perez, J.

## <u>CERTIFICATE OF SERVICE</u>

I, Samantha B. Kats, Esquire, hereby certify that on September __, 2023, I caused a true and correct copy of the foregoing Rule 11 Motion for sanctions, exhibits thereto and Brief in support thereof to be filed electronically with the Court, where it is available for viewing and downloading from the Court's electronic filing system, and that such electronic filing automatically generates a Notice of Filing constituting service of the filed document on the counsel of record identified on the docket.

_____

Samantha B. Kats

# EXHIBIT 1



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/249,174 | 04/09/2014 | Russell LEVI | 3258 | 1073 |

77345          7590          01/27/2015
Graeser Associates International Inc.
70 West Madison
Suite 1400
Chicago, IL 60602

| EXAMINER |
|---|
| JAVAID, JAMAL |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2412 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/27/2015 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

dgraeser@gai-ip.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 14/249,174 | | Applicant(s) LEVI, RUSSELL | |
| | Examiner JAMAL JAVAID | | Art Unit 2412 | AIA (First Inventor to File) Status No |

| -- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* -- |

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *4/9/2014*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.        2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) *1-19* is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1-19* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on *4/9/2014* is/are: a)☒ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All   b)☐ Some** c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

Application/Control Number: 14/249,174                                    Page 2
Art Unit: 2412

## DETAILED ACTION

### Status of Case

1.    This Office Action is in response to the application being filed on 4/9/2014.

2.    Claims 1-19 are pending. Claims 1, 13, and 19 are the independent claims.


### Claim Rejections - 35 USC § 103

3.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

4.    Claims 1, 7, 9-13, and 17-19 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Luo (USPN 7,469,294) in view of Knox (USPAN 2007/0225019) and

Wu (USPAN 2008/0069065).

Consider claims 1 and 13, Luo disclose a method and computing apparatus for

operating a single network adapter for use on a first sub-network and a second sub-

network **(see elements 30 and 32, which are taken collectively to constitute said**

**network adapter)**, comprising:

setting up a first network address and routing table in the network adapter for use

in the first sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40,**

**col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is**

**said first routing table)**;

Application/Control Number: 14/249,174                                      Page 3
Art Unit: 2412

setting up a second network address and routing table in the network adapter for use in the second sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40, col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is said second routing table)**;

using the network adaptor to receive data for one of the first and second sub-networks, and re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**;

wherein the first sub-network includes a network gateway **(see element 30 in figure 3, which is a gateway that is in the first sub-network)** and the network adapter controls access from the second sub-network to the network gateway **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**,

wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network **(see element 100 in figure 5 and col. 3 lines 22-26, wherein disclosed is receiving a request at the VGH from a remote user for connection with a virtual private network)**, verifying the user's access rights **(see col. 3 lines 26-29 and col. 6 lines 10-12, wherein disclosed is authenticating the remote user)**, and allowing the user to

Application/Control Number: 14/249,174                                    Page 4
Art Unit: 2412

access the gateway if and only if the user is entitled to access the gateway **(see elements 102 and 104 in figure 5 and col. 6 lines 14-15, wherein disclosed is that a successful authorization operation associates the remote user with a VPN)**, or blocking the user access to the gateway if the user is not entitled to access the gateway **(see elements 102 and 103 in figure 5 and col. 6 lines 11-12, wherein disclosed is terminating the session if the user is not authorized by the VHG)**.

Luo does not specifically disclose that the network adapter is configured as a hotspot controller.

Knox teaches that a network adapter is configured as a hotspot controller **(see paragraph 0034, wherein disclosed is that the mobile device 50 may serve as a hub or hot spot, i.e. configured as a hotspot controller)**, and *further teaches*

setting up a network address and routing table in the network adapter **(see paragraph 0034, wherein disclosed is that the mobile device 50 maintains a record of the address routing table for the network, which it can transmit to an intelligent base station 20)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the invention of Luo and have that a network adapter is configured as a hotspot controller, as taught by Knox, thus allowing control of hotspot connections in a wireless communication system, as well as enabling internet based applications to run in a high-speed mobile environment and function as if they were on a traditional, stationary, wired network and was designed with a layered self-healing router to enhance optimum performance **(see paragraph 0002)**.

Application/Control Number: 14/249,174                                    Page 5
Art Unit: 2412

     Luo and Knox do not specifically disclose a single network adapter comprising a single network interface card or module.

     Wu teaches a single network adapter comprising a single network interface card or module **(see paragraph 0026, wherein disclosed is using a single wireless network interface adaptor, which is disclosed to refer to a network card)**.

     It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the combined inventions of Luo and Knox and have a single network adapter comprising a single network interface card or module, as taught by Wu, thus providing a method of seamlessly roaming between multiple wireless networks using a single wireless interface adaptor for use with wireless roaming in real-time communication environments **(see paragraph 0009 of Wu)**.


     Consider claims 7 and 17, Luo discloses that the verifying comprises retrieving locally or remotely stored user subscription information or information about user permission to access the gateway **(see col. 6 lines 10-17, wherein disclosed is authoring the remote user either locally or by sending a request to the SP AAA server, i.e. remotely)**.


     Consider claim 9, Luo discloses performing the method by executing driver software to configure a standard network adapter to exchange network traffic between the first and second sub-networks **(see col. 4 lines 15-17 and col. 5 lines 34-36, wherein disclosed is said software that can be executed to perform the teachings**

Application/Control Number: 14/249,174                                    Page 6
Art Unit: 2412

**of Luo, such as exchanging network traffic between the first and second sub-networks, as disclosed in col. 5 lines 24-28).**

Consider claims 10 and 18, Luo discloses that the step of receiving data comprises authorising and authenticating a user **(see col. 3 lines 26-29 and col. 6 lines 10-12, wherein disclosed is authorizing/authenticating the remote user)**.

Consider claim 11, Luo discloses that the second sub-network includes a plurality of devices, said plurality of devices incorporating a respective plurality of network interface cards or modules, said network interface card or module being configured to communicate directly with said plurality of network interface cards or modules **(see figure 3)**.

Consider claim 12, Luo, in view of Wu, discloses that the first sub-network and second sub-network are within wireless communication range of said single network interface card or module **(see figure 3)**.

Consider claim 19, Luo disclose a method for operating a single network adapter for use on a first sub-network and a second sub-network of the same type **(see elements 30 and 32, which are taken collectively to constitute said network adapter)**, the second sub-network including a plurality of devices, said plurality of devices incorporating a respective plurality of network interface cards or modules, said

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/249,174 | 04/09/2014 | Russell LEVI | 3258 | 1073 |

77345        7590        01/27/2015
Graeser Associates International Inc.
70 West Madison
Suite 1400
Chicago, IL 60602

| EXAMINER |
|---|
| JAVAID, JAMAL |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2412 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/27/2015 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

dgraeser@gai-ip.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No.<br>14/249,174 | Applicant(s)<br>LEVI, RUSSELL | |
|---|---|---|---|
| | Examiner<br>JAMAL JAVAID | Art Unit<br>2412 | AIA (First Inventor to File)<br>Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒  Responsive to communication(s) filed on *4/9/2014*.
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) *1-19* is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1-19* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on *4/9/2014* is/are: a)☒ accepted or b)☐ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
a)☐ All   b)☐ Some**  c)☐ None of the:
1.☐  Certified copies of the priority documents have been received.
2.☐  Certified copies of the priority documents have been received in Application No. _____.
3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
Paper No(s)/Mail Date _____.

3)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

Application/Control Number: 14/249,174                                          Page 2

Art Unit: 2412

<div align="center">

**DETAILED ACTION**

***Status of Case***

</div>

1.      This Office Action is in response to the application being filed on 4/9/2014.

2.      Claims 1-19 are pending. Claims 1, 13, and 19 are the independent claims.

<div align="center">

***Claim Rejections - 35 USC § 103***

</div>

3.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

4.      Claims 1, 7, 9-13, and 17-19 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Luo (USPN 7,469,294) in view of Knox (USPAN 2007/0225019) and

Wu (USPAN 2008/0069065).

Consider claims 1 and 13, Luo disclose a method and computing apparatus for

operating a single network adapter for use on a first sub-network and a second sub-

network **(see elements 30 and 32, which are taken collectively to constitute said**

**network adapter)**, comprising:

setting up a first network address and routing table in the network adapter for use

in the first sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40,**

**col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is**

**said first routing table)**;

Application/Control Number: 14/249,174                                    Page 3
Art Unit: 2412

setting up a second network address and routing table in the network adapter for use in the second sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40, col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is said second routing table)**;

using the network adaptor to receive data for one of the first and second sub-networks, and re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**;

wherein the first sub-network includes a network gateway **(see element 30 in figure 3, which is a gateway that is in the first sub-network)** and the network adapter controls access from the second sub-network to the network gateway **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**,

wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network **(see element 100 in figure 5 and col. 3 lines 22-26, wherein disclosed is receiving a request at the VGH from a remote user for connection with a virtual private network)**, verifying the user's access rights **(see col. 3 lines 26-29 and col. 6 lines 10-12, wherein disclosed is authenticating the remote user)**, and allowing the user to

Application/Control Number: 14/249,174                                     Page 4
Art Unit: 2412

access the gateway if and only if the user is entitled to access the gateway **(see elements 102 and 104 in figure 5 and col. 6 lines 14-15, wherein disclosed is that a successful authorization operation associates the remote user with a VPN)**, or blocking the user access to the gateway if the user is not entitled to access the gateway **(see elements 102 and 103 in figure 5 and col. 6 lines 11-12, wherein disclosed is terminating the session if the user is not authorized by the VHG)**.

Luo does not specifically disclose that the network adapter is configured as a hotspot controller.

Knox teaches that a network adapter is configured as a hotspot controller **(see paragraph 0034, wherein disclosed is that the mobile device 50 may serve as a hub or hot spot, i.e. configured as a hotspot controller)**, and *further teaches*

setting up a network address and routing table in the network adapter **(see paragraph 0034, wherein disclosed is that the mobile device 50 maintains a record of the address routing table for the network, which it can transmit to an intelligent base station 20)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the invention of Luo and have that a network adapter is configured as a hotspot controller, as taught by Knox, thus allowing control of hotspot connections in a wireless communication system, as well as enabling internet based applications to run in a high-speed mobile environment and function as if they were on a traditional, stationary, wired network and was designed with a layered self-healing router to enhance optimum performance **(see paragraph 0002)**.

Application/Control Number: 14/249,174                                                  Page 5
Art Unit: 2412

Luo and Knox do not specifically disclose a single network adapter comprising a single network interface card or module.

Wu teaches a single network adapter comprising a single network interface card or module **(see paragraph 0026, wherein disclosed is using a single wireless network interface adaptor, which is disclosed to refer to a network card)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the combined inventions of Luo and Knox and have a single network adapter comprising a single network interface card or module, as taught by Wu, thus providing a method of seamlessly roaming between multiple wireless networks using a single wireless interface adaptor for use with wireless roaming in real-time communication environments **(see paragraph 0009 of Wu)**.


Consider claims 7 and 17, Luo discloses that the verifying comprises retrieving locally or remotely stored user subscription information or information about user permission to access the gateway **(see col. 6 lines 10-17, wherein disclosed is authoring the remote user either locally or by sending a request to the SP AAA server, i.e. remotely)**.


Consider claim 9, Luo discloses performing the method by executing driver software to configure a standard network adapter to exchange network traffic between the first and second sub-networks **(see col. 4 lines 15-17 and col. 5 lines 34-36, wherein disclosed is said software that can be executed to perform the teachings**

Application/Control Number: 14/249,174                                           Page 6
Art Unit: 2412

**of Luo, such as exchanging network traffic between the first and second sub-**

**networks, as disclosed in col. 5 lines 24-28**).

        Consider claims 10 and 18, Luo discloses that the step of receiving data

comprises authorising and authenticating a user **(see col. 3 lines 26-29 and col. 6**

**lines 10-12, wherein disclosed is authorizing/authenticating the remote user)**.

        Consider claim 11, Luo discloses that the second sub-network includes a plurality

of devices, said plurality of devices incorporating a respective plurality of network

interface cards or modules, said network interface card or module being configured to

communicate directly with said plurality of network interface cards or modules **(see**

**figure 3)**.

        Consider claim 12, Luo, in view of Wu, discloses that the first sub-network and

second sub-network are within wireless communication range of said single network

interface card or module **(see figure 3)**.

        Consider claim 19, Luo disclose a method for operating a single network adapter

for use on a first sub-network and a second sub-network of the same type **(see**

**elements 30 and 32, which are taken collectively to constitute said network**

**adapter)**, the second sub-network including a plurality of devices, said plurality of

devices incorporating a respective plurality of network interface cards or modules, said

Application/Control Number: 14/249,174                                           Page 7
Art Unit: 2412

network interface card or modules being configured to communicate directly with said plurality of network interface cards or modules **(see figure 3)**, the method comprising:

setting up a first network address and routing table in the network adapter for use in the first sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40, col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is said first routing table)**;

setting up a second network address and routing table in the network adapter for use in the second sub-network **(see elements 108 and 110 in figure 5 and col. 3 lines 36-40, col. 3 lines 50-54, col. 4 lines 59-67, and col. 6 lines 19-30, wherein disclosed is said second routing table)**;

using the network adaptor to receive data for one of the first and second sub-networks, and re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**;

wherein the first sub-network includes a network gateway **(see element 30 in figure 3, which is a gateway that is in the first sub-network)** and the network adapter controls access from the second sub-network to the network gateway **(see col. 5 lines 24-28, wherein disclosed is that the VGH operates as a provider edge (PE) router and receives data from the remote user from one sub-network and forwards it to the second sub-network)**,

Application/Control Number: 14/249,174                                    Page 8
Art Unit: 2412

wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network **(see element 100 in figure 5 and col. 3 lines 22-26, wherein disclosed is receiving a request at the VGH from a remote user for connection with a virtual private network)**, verifying the user's access rights **(see col. 3 lines 26-29 and col. 6 lines 10-12, wherein disclosed is authenticating the remote user)**, and allowing the user to access the gateway if and only if the user is entitled to access the gateway **(see elements 102 and 104 in figure 5 and col. 6 lines 14-15, wherein disclosed is that a successful authorization operation associates the remote user with a VPN)**, or blocking the user access to the gateway if the user is not entitled to access the gateway **(see elements 102 and 103 in figure 5 and col. 6 lines 11-12, wherein disclosed is terminating the session if the user is not authorized by the VHG)**.

Luo does not specifically disclose that the network adapter is configured as a hotspot controller.

Knox teaches that a network adapter is configured as a hotspot controller **(see paragraph 0034, wherein disclosed is that the mobile device 50 may serve as a hub or hot spot, i.e. configured as a hotspot controller)**, and *further teaches*

setting up a network address and routing table in the network adapter **(see paragraph 0034, wherein disclosed is that the mobile device 50 maintains a record of the address routing table for the network, which it can transmit to an intelligent base station 20)**.

Application/Control Number: 14/249,174                                      Page 9
Art Unit: 2412

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the invention of Luo and have that a network adapter is configured as a hotspot controller, as taught by Knox, thus allowing control of hotspot connections in a wireless communication system, as well as enabling internet based applications to run in a high-speed mobile environment and function as if they were on a traditional, stationary, wired network and was designed with a layered self-healing router to enhance optimum performance **(see paragraph 0002)**.

Luo and Knox do not specifically disclose a single network adapter comprising a single network interface card or module.

Wu teaches a single network adapter comprising a single network interface card or module **(see paragraph 0026, wherein disclosed is using a single wireless network interface adaptor, which is disclosed to refer to a network card)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the combined inventions of Luo and Knox and have a single network adapter comprising a single network interface card or module, as taught by Wu, thus providing a method of seamlessly roaming between multiple wireless networks using a single wireless interface adaptor for use with wireless roaming in real-time communication environments **(see paragraph 0009 of Wu)**.

5.      Claim 2 is rejected under 35 U.S.C. 103(a) as being unpatentable over Luo (USPN 7,469,294) in view of Knox (USPAN 2007/0225019), Wu (USPAN 2008/0069065), and Biswas (USPAN 2007/0019540).

Application/Control Number: 14/249,174                                    Page 10
Art Unit: 2412

Consider claim 2, Luo discloses a first sub-network and a second sub-network **(see figure 3, wherein disclosed are said first and second sub-networks)**, wherein the second sub-network comprises a routable sub-network **(see figure 3, wherein the second sub-network comprises a routable sub-network from elements 50/54/56/60 to elements 52/58/62 to element 30)**.

Luo, Knox, and Wu combined do not specifically disclose a NAT routable sub-network, which is subservient to a first sub-network.

Biswas teaches a NAT routable sub-network, which is subservient to a first sub-network **(see abstract and figure 1, wherein disclosed are active and redundant network devices, each of which comprise a NAT, wherein each of said network devices are taken to be in a separate sub-network and the redundant network device in the second sub-network is subservient to the active network device in the first sub-network)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the combined inventions of Luo, Knox, and Wu and have a NAT routable sub-network, which is subservient to a first sub-network, as taught by Biswas, thus providing network address translation in a sub-network, as well as implementing redundancy based routing in an environment that uses NAT across different address spaces **(see paragraph 0002)**.

6.      Claims 3 and 14 are rejected under 35 U.S.C. 103(a) as being unpatentable over Luo (USPN 7,469,294) in view of Knox (USPAN 2007/0225019), Wu (USPAN 2008/0069065), Geoffrion (USPAN 2005/0182839), and Dutta (USPN 7,296,091).

Application/Control Number: 14/249,174                                    Page 11
Art Unit: 2412

Consider claims 3 and 14, Luo, Knox, and Wu combined do not specifically disclose generating broadcasts to inform wireless stations about an internet gateway.

Geoffrion teaches generating broadcasts to inform wireless stations about an internet gateway **(see paragraphs 0102-0103, wherein disclosed is said generating of broadcasts for said purpose of informing wireless stations about said gateway)**.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the combined inventions of Luo, Knox, and Wu and have generating broadcasts to inform wireless stations about an internet gateway, as taught by Geoffrion, thus providing a method for providing a larger bandwidth to users in order to be able to share large amount of data without requiring a large amount of overhead traffic **(see paragraphs 0006 and 0010)**.

Luo, Knox, Wu, and Geoffrion combined do not specifically disclose that the network gateway is provided by a wireless internet router or sending the broadcasts to the wireless internet router for forwarding to the wireless network.

Dutta teaches that the network gateway is provided by a wireless internet router **(see col. 9 lines 18-29, wherein disclosed is that the Internet gateway is a router)** and sending the broadcasts to the wireless internet router for forwarding to the wireless network **(see col. 9 lines 18-29, wherein disclosed is that the broadcasts are transmitted to the Internet gateway, which is a router, located near the server's location)**.

Application/Control Number: 14/249,174                          Page 12
Art Unit: 2412

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the combined inventions of Luo, Knox, Wu, and Geoffrion

and have that the network gateway is provided by a wireless internet router and sending

the broadcasts to the wireless internet router for forwarding to the wireless network, as

taught by Dutta, thus providing a method for utilizing network multicast communication

for providing the broadcast of content between a broadcast source and a client to avail

a global content and/or a local content to users **(see col. 1 lines 7-12)**.


7.      Claims 4-5 and 15-16 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Luo (USPN 7,469,294) in view of Knox (USPAN 2007/0225019), Wu (USPAN

2008/0069065), Geoffrion (USPAN 2005/0182839), Dutta (USPN 7,296,091), and

Regan (USPAN 2006/0023730).

Consider claims 4 and 15, Luo, Knox, Wu, Geoffrion, and Dutta combined do not

specifically disclose generating and sending broadcasts on the wireless network at a

sufficient rate to override broadcasts from the wireless internet router which indicates

the wireless internet router to be an internet gateway.

Regan teaches generating and sending broadcasts on the wireless network at a

sufficient rate to override broadcasts from the wireless internet router which indicates

the wireless internet router to be an internet gateway **(see figures 2 and 5 and

paragraphs 0012, 0014, and 0033-0038, wherein disclosed is said generating and

sending of broadcasts at said sufficient rate to override broadcasts from the

wireless router)**.

Application/Control Number: 14/249,174                                              Page 13
Art Unit: 2412

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the combined inventions of Luo, Knox, Wu, Geoffrion,

and Dutta and have generating and sending broadcasts on the wireless network at a

sufficient rate to override broadcasts from the wireless internet router which indicates

the wireless internet router to be an internet gateway, as taught by Regan, thus

providing a method for differential updates for data broadcasting **(see paragraph 0001)**.


Consider claims 5 and 16, Luo, Knox, Wu, Geoffrion, and Dutta combined do not

specifically disclose automatically detecting packets on at least one of the first and

second sub-networks that are not using the hotspot controller as the network gateway

and automatically adjusting the frequency of the broadcasts on the wireless network

which set the network adapter as the network gateway according to the number of such

packets that are detected.

Regan teaches automatically detecting packets on at least one of the first and

second sub-networks that are not using the hotspot controller as the network gateway

and automatically adjusting the frequency of the broadcasts on the wireless network

which set the network adapter as the network gateway according to the number of such

packets that are detected **(see figures 2 and 5 and paragraphs 0012, 0014, and

0033-0038, wherein disclosed is said detecting of packets via receiving profile

information, received through packets, and then adjusting a rate of recurrence of

broadcast information according to the detected packets)**.

Application/Control Number: 14/249,174                          Page 14
Art Unit: 2412

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the combined inventions of Luo, Knox, Wu, Geoffrion,

and Dutta and have automatically detecting packets on at least one of the first and

second sub-networks that are not using the hotspot controller as the network gateway

and automatically adjusting the frequency of the broadcasts on the wireless network

which set the network adapter as the network gateway according to the number of such

packets that are detected, as taught by Regan, thus providing a method for differential

updates for data broadcasting **(see paragraph 0001)**.

8.      Claim 6 is rejected under 35 U.S.C. 103(a) as being unpatentable over Luo

(USPN 7,469,294) in view of Knox (USPAN 2007/0225019), Wu (USPAN

2008/0069065), Geoffrion (USPAN 2005/0182839), Dutta (USPN 7,296,091), and

Klamer (USPAN 2005/0163223).

Consider claim 6, Luo, Knox, Wu, Geoffrion, and Dutta combined do not

specifically disclose receiving a user instruction to adjust the rate of generating and

sending broadcasts and adjusting said rate according to the user instruction.

Klamer teaches receiving a user instruction to adjust the rate of generating and

sending broadcasts and adjusting said rate according to the user instruction **(see**

**paragraph 0030, wherein the transcoder allows the user to adjust the bit rates,**

**frame rates, and broadcast format of data)**.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the combined inventions of Luo, Knox, Wu, Geoffrion,

and Dutta and have receiving a user instruction to adjust the rate of generating and

Application/Control Number: 14/249,174                                              Page 15
Art Unit: 2412

sending broadcasts and adjusting said rate according to the user instruction, as taught
by Klamer, thus providing an apparatus that can store data on network-accessible
storage devices and transcode data between formats **(see paragraph 0005)**.

9.      Claim 8 is rejected under 35 U.S.C. 103(a) as being unpatentable over Luo
(USPN 7,469,294) in view of Knox (USPAN 2007/0225019), Wu (USPAN
2008/0069065), and Dutta (USPN 7,296,091).

        Consider claim 8, although Luo discloses the gateway for users connecting via
the second sub-network **(see above)**, Luo, Knox, and Wu combined do not specifically
disclose controlling the allocated bandwidth.

        Dutta teaches controlling an allocated bandwidth **(see col. 5 lines 1-4, wherein
disclosed is said bandwidth control)**.

        It would have been obvious to one of ordinary skill in the art at the time the
invention was made to modify the combined inventions of Luo, Knox, and Wu and have
controlling an allocated bandwidth, as taught by Dutta, thus providing a method for
utilizing network multicast communication for providing the broadcast of content
between a broadcast source and a client to avail a global content and/or a local content
to users **(see col. 1 lines 7-12)**.

### *Conclusion*

10.     Any inquiry concerning this communication or earlier communications from the
examiner should be directed to Jamal Javaid whose telephone number is 571-270-5137
and email address is Jamal.Javaid@uspto.gov.

Application/Control Number: 14/249,174                                    Page 16
Art Unit: 2412

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Charles Jiang, can be reached on 571-270-7191.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

/JAMAL JAVAID/

Primary Examiner, Art Unit 2412

<u>EXHIBIT 2</u>

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Applicant: | § | |
| | § | |
| Levi RUSSEL | § | |
| | § | |
| Serial No.: US 14249174 | § | |
| | § | Group Art Unit: |
| | § | 2412 |
| Filed: April 9 2014 | § | |
| | § | Attorney Docket: **3258** |
| For: METHOD AND SYSTEM FOR | § | |
| OPERATING A WIRELESS ACCESS POINT FOR | § | |
| PROVIDING ACCESS TO A NETWORK | § | |
| | § | |
| Examiner: JAVAID, J. | § | |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO NON-FINAL OFFICE ACTION

Sir:

This Amendment is filed in response to the Non-Final Office Action dated January 27 2015, issued by the United States Patent and Trademark Office in connection with the above-identified Application, which is being filed on or before July 27 2015, with three months' late fees and the requisite petition thereof.

Kindly amend the above-identified application as follows:

**Amendments to the Claims** are reflected in the listing of claims that begins on page 2 of this paper.

**Remarks/Arguments** begin on page 9 of this paper.

**AMENDMENTS TO THE CLAIMS**:

This listing of claims will replace all prior versions, and listings, of claims in the application:

1.    (original) A method of operating a single network adapter, comprising a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network, the method comprising:

setting up a first network address and routing table in the network interface card or module for use in the first sub-network;

setting up a second network address and routing table in the network interface card or module for use in the second sub-network;

using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables,

wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and

wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway.

2

2.    (original) The method as claimed in claim 1, wherein the second sub-network comprises a NAT routable sub-network that is subservient to the first sub-network.

3.    (original) The method as claimed in claim 1, wherein the network gateway is provided by a wireless internet router, the first and second sub-network belong to a wireless network, and the method further comprises:

generating broadcasts to inform wireless stations that the single network adapter is an internet gateway, and

sending the broadcasts to the wireless internet router for forwarding to the wireless network.

4.    (original) The method as claimed in claim 3, further comprising generating and sending said broadcasts on the wireless network at a sufficient rate to override broadcasts from the wireless internet router which indicates the wireless internet router to be an internet gateway.

5.    (original) The method as claimed in claim 4, further comprising automatically detecting packets on at least one of the first and second sub-networks that are not using the hotspot controller as the network gateway, and automatically adjusting the frequency of said broadcasts on the wireless network which set the network adapter as the network gateway, according to the number of such packets that are detected.

6.      (original) The method as claimed in claim 3, further comprising receiving a user instruction to adjust the rate of generating and sending said broadcasts on the wireless network setting the network adapter as the gateway, and adjusting said rate according to the user instruction.

7.      (original) The method as claimed in claim 1, wherein said verifying comprises retrieving locally or remotely stored user subscription information or information about user permissions to access the gateway.

8.      (original) The method as claimed in claim 1, further comprising controlling an allocated bandwidth through the gateway for users connecting via the second sub-network.

9.      (original) The method as claimed in claim 1, wherein said method is performed by executing driver software to configure a standard network adapter to exchange network traffic between the first and second sub-networks.

10.     (original) The method as claimed in claim 1, wherein the step of receiving data comprises authorising and authenticating a user.

11.     (original) The method as claimed in claim 1, wherein the second sub-network includes a plurality of devices, said plurality of devices incorporating a respective plurality of network interface cards or modules, said network interface card or module being configured to communicate directly with said plurality of network interface cards or modules.

4

12.    (original) The method as claimed in claim 1, wherein the first sub-network and second sub-network are within wireless communication range of said single network interface card or module.

13.    (original) A computing apparatus for exchanging network data traffic between a first sub-network and a second sub-network, the apparatus comprising:

     a network adapter, comprising a single network interface card or module, for communicating wirelessly with the first sub-network and second sub-network;

     a processor;

     a data store storing a driver for the network interface card or module, the driver being configured to store a first network address and routing table for use in the first sub-network; a second network address and routing table for use in the second sub-network; to operate said single network interface card or module to receive data for one of the first and second sub-networks and to re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables,

     wherein the first sub-network includes a network gateway and the network interface card or module is configured to control access from the second sub-network to the network gateway and comprises an authentication controller for receiving a request from a user via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if the user is entitled to access the

5

gateway, or blocking the user access to the gateway if the user is not entitled to access the gateway.

14.    (original) The apparatus as claimed in claim 13, wherein the network gateway is provided by a wireless internet router, the first and second sub-network belong to a wireless network, and the apparatus further comprises a transmitter for generating broadcasts to inform stations that the single network adapter is an internet gateway, and sending the broadcasts to the wireless internet router for forwarding to the wireless network.

15.    (original) The apparatus as claimed in claim 14, wherein the transmitter is configured to generate and send said broadcasts on the wireless network at a sufficient rate to override broadcasts from the wireless internet router which indicates the wireless internet router to be an internet gateway.

16.    (original) The apparatus as claimed in claim 15, further comprising a packet detector for automatically detecting packets on at least one of the first and second sub-networks that are not using the hotspot controller as the network gateway, and automatically adjusting the frequency of said broadcasts on the wireless network which set the network adapter to as the network gateway, according to the number of such packets that are detected.

17.    (original) The apparatus as claimed in claim 13, wherein the authentication controller comprises locally stored user subscription information or information about user permissions to access the gateway, or a retrieval

6

system for retrieving user subscription information or information about user permissions from a remote location.

18.    (original) The apparatus as claimed in claim 13, wherein the authentication controller is programmed to authorise and authenticate a user.

19.    (original) A method of operating a single network adapter consisting of a single network interface card or module for communicating with a local area network that includes a first sub-network and a second sub-network of the same type, the second sub-network including a plurality of devices, said plurality of devices incorporating a respective plurality of network interface cards or modules, said network interface card or module being configured to communicate directly with said plurality of network interface cards or modules, and the method comprising:

setting up a first network address and routing table in the network interface card or module for use in the first sub-network;

setting up a second network address and routing table in the network interface card or module for use in the second sub-network;

using the network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables,

wherein the first sub-network includes a network gateway and the network interface card or module is configured as a hotspot controller to control access from the second sub-network to the network gateway, and

wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway.

**REMARKS/ARGUMENTS**

Reconsideration and allowance of this application are respectfully requested. Currently, claims 1 to 19 are pending in this application.

As a precaution against a possible misunderstanding regarding the content of the presently claimed invention, Applicant notes that the present rejection of claim 1 (and others) appears to be based on the previous version of the claim (claim 30) in the parent application (13/127,223). By way of example to assist the Examiner, claim 1 as filed requires that the first and second routing tables are set up on the (single) network interface card or module, whereas the rejection of claim 1 refers instead to routing tables being set up on the network adapter, as per claim 30 of 13/127,223.

Should such a misunderstanding have arisen, Applicant respectfully requests issuance of a second Non-final Office Action, rather than a Final Office Action, should the Examiner feel that an additional office action is necessary.

**Rejections under 35 U.S.C. §103 in view of Luo, Knox and Wu**:

Claims 1, 7, 9-13 and 17-19 were rejected under 35 U.S.C. §103(a) as allegedly being obvious in view of Luo et al (US 7,469,294, henceforth "Luo"), Knox et al (US 2007/0225019, henceforth "Knox") and Wu et al (US 2008/0069065, henceforth "Wu"). Applicant traverses this rejection.

In order to establish a *prima facie* case of obviousness, all of the claim limitations must be taught or suggested by the prior art. The combination of Luo in view of Knox and Wu fails to teach or suggest all of the claim limitations of independent Claims 1, 13 and 19.

9

Taking one specific example, none of Luo, Knox or Wu, either in isolation or in combination, teach or suggest: setting up a first and a second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-network.

Luo contains no teaching or suggestion of a single network interface card or module, let alone such a card or module with two network address and routing tables and in communication with a first and second sub-network in the manner required by the claims. With regard to Knox, the paragraph highlighted by the Examiner (p. 2, para 34) states merely that '*the mobile device 50 maintains a record of the address routing table for the network that can be transmitted to the intelligent base stations 20 of the network to maintain connectivity with the network*', which refers only to a single routing table and is silent as to where it is stored. Wu does not appear to make any reference at all to a network address and routing table, let alone two such tables stored in a single network interface card or module.

Additionally Luo fails to teach or suggest – and Knox and Wu fail to remedy the deficiency of – the further features of: using an aforesaid single network interface card or module to receive data for one sub-network and re-transmit the data to the other sub-network using the network address and routing tables and, consequently (using the single network interface card or module as aforesaid), receiving a request from a user via the second sub-network to access a gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway.

Furthermore, the Examiner does not specify what in the prior art he considers to correspond to the claimed elements of the first and second sub-network. A *prima facie* case of obviousness requires reasoning in respect of all claim elements. As per *In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970), all words in a claim must be considered in judging the patentability of that claim against the prior art.

In the interest of expediency, given that a similar rejection was raised for the claims of the parent application (US 13127223) in the Office Action of October 9th, 2013, the Examiner's additional remarks in that Office Action regarding the construction of the first and second sub-network will be considered, without making any admissions as to the relevancy thereof and without wishing to craft a rejection or imply same. In paragraph 3.b on page 3 of the Office Action of October 9th, 2013, the Examiner states: "*elements 30-38 and 68-70 in figure 3 of Luo were taken as comprising the "first sub-network" and elements 50-62 in figure 3 of Luo were taken as comprising the "second sub-network". This interpretation … allows for the first sub-network to include the network gateway (element 30 in figure 3 of Luo) and a request is received from a user via the second sub-network (see the user 50, for example, in figure 3 of Luo), which resides in the second sub-network.*" According to this construction, the first sub-network is construed by the Examiner as the entirety of the service provider network (30, 32, 68) and the entirety of the customer VPN (36, 38, 70), and the second sub-network is construed by the Examiner as the exclusively non-wireless and long distance network infrastructure elements 50-62 (consisting of a Packet Switched Telephone Network, PSTN,

Digital Subscriber Line, DSL, Access Network and the Internet) via which a remote user can connect to the customer VPN.

However, the construction asserted by the Examiner fails for several reasons, including:

(1) Applicant still maintains that the VHG 30 and AAA server 32 cannot be construed as 'a single network adapter'. The Examiner notes in the Office Action of October 9th, 2013 that "*it is reasonable to collectively take multiple elements taught by the prior art and view them collectively as a single element for claim interpretation purposes*". However, according to MPEP §2111.01, the words of a claim must be given the "plain meaning" unless such meaning is inconsistent with the specification. The person of ordinary skill in the art would understand the plain meaning in the art of a 'network adapter' and would recognise, based on the description of Luo (for example at col. 4, l. 58-64) that the VHG 30 and (described as optional) AAA server 32 are two separate networked devices within a network (the service provider network) and each, by definition, include a separate network adapter. The Examiner later suggests that <u>Wu</u> in fact teaches 'a single network adapter', comprising a single network interface card or module. The Examiner states that Paragraph 26 of Wu discloses "*using a single wireless network interface adaptor, which is disclosed to refer to a network card*". The referenced paragraph in Wu defines a 'network adaptor' <u>as</u> a card or built-in hardware used to connect a computer or handheld device to a network. The Wu reference thus directly contradicts the asserted construction in which VHG 30 and AAA server 32 of Luo correspond to 'a single network adapter' (furthermore demonstrating that Wu is incompatible with the

Luo reference and that in fact a combination of these references would be inoperable).

(2) According to the present alleged construction, the VHG 30 is construed both as (a) a constituent part of 'a single network adapter' and (b) 'a gateway' in a first sub-network with which said single network adapter communicates wirelessly. This a logical and practical impossibility (a part of a network adapter does not communicate wirelessly with itself), and a construction which the person of ordinary skill in the art would clearly reject as offending the plain meaning of the words of the claim. Furthermore this reading is a violation of the principles of claim construction; it is not permissible to read separate claim elements onto a single prior art element. Each claim element must be construed separately.

For at least these reasons the asserted construction fails, and thus reasoning is not provided to support a *prima facie* case of obviousness.

Furthermore, it is respectfully submitted that the Knox and Wu references cannot properly be combined with the Luo reference because they are not analogous prior art: Luo specifically concerns authorization, authentication and accounting for a single fixed, wired and private network (VPN). Knox, meanwhile, relates to hardware and software for broadband wireless communications (p. 1, para 2), in particular for allowing access to a public network on a moving train. Wu relates to a method of seamlessly roaming between multiple wireless networks, and focuses on the problem of maintaining real-time IP data transmission in an IP telephony service while roaming between different networks (p. 1, para 2). Knox and Wu concern different

problems in different fields. Thus it is respectfully submitted that Knox and Wu are non-analogous prior art to Luo, and thus cannot properly be combined.

For all of these reasons it is submitted that a *prima facie* case of obviousness has not been established in respect of claims 1, 13 and 19.

Claims 7, 9-12, 17 and 18 depend on claims 1 and 13 and include all features therefrom, and thus are patentable for at least the reasons given above in relation to claims 1 and 13.

Accordingly, Applicant requests that the rejection under 35 U.S.C. §103 in view of Luo, Knox and Wu be withdrawn.


## Other Rejections under 35 U.S.C. §103

Claims 2–6, 8 and 14–16 depend on claims 1 and 13 and include all features therefrom, and thus are patentable for at least the reasons given above in relation to claims 1 and 13.

For these reasons, Applicant requests that all other rejections under 35 U.S.C. §103 be withdrawn.

Thus, for the reasons given above, claims 1-19 are novel and non-obvious over the above references, alone or in combination.

<u>**Conclusion**</u>:

     Applicant believes that this entire application is in condition for allowance and respectfully requests a notice of allowance. If the Examiner has any questions or believes that an interview would further prosecution of this application, the Examiner is invited to telephone the undersigned at 857-334-1124.


                                            Respectfully submitted,

                                            <u>/D'vorah Graeser, Reg No 40,000/</u>
                                            Dvorah Graeser
                                            Agent for Applicant(s)
                                            Registration No.  40,000

Dated: 27 July 2015

EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BOUNTS TECHNOLOGIES LTD., | : |
| Plaintiff, | : |
| | : CASE NO. 2:23-cv-890 |
| v. | : |
| | : Judge Mia Roberts Perez |
| CONNECTIFY, INC. AND DOES 1-100, | : |
| | : |
| Defendants. | : |

## DECLARATION OF KEVIN CASEY, ESQ. IN SUPPORT OF CONNECTIFY'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I, Kevin Casey, do declare and state as follows:

1.      I am a resident of the Commonwealth of Pennsylvania. I am admitted to, and am a member in good standing of, the bar of the Commonwealth of Pennsylvania.

2.      I am a partner in the law firm of Stradley Ronon Stevens & Young, LLP, which represents the Defendant, Connectify, Inc., in this litigation.

3.      I have personal knowledge of the facts stated in this Declaration.

4.      I submit this Declaration in support of Connectify's Opening Brief in Support of its Motion for Sanctions Under Federal Rule of Civil Procedure 11.

5.      Immediately after Bounts filed this lawsuit on March 8, 2023, I studied Bounts' U.S. Patent No. 9,258,309 (the "Patent-in-Suit"), learned about Connectify's products and the methods of using those products, and analyzed whether any of Connectify's products or the methods of using those products infringe any claim of the Patent-in-Suit.  I determined that Connectify's products and methods do not infringe.

6.      Attached to this Declaration as **Exhibit A** is a true and correct copy of a document titled "ANALYSIS OF US 9,258,309 B2" that I drafted with Kamran Emdadi, a patent attorney working with Connectify.  I sent the document to Todd E. Zenger, Esq., counsel for Bounts, on March 17, 2023.  The analysis reflected in that document confirms that Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law.

7.      After I sent the document to Mr. Zenger, Mr. Emdadi and I conferred with Mr. Zenger on the same day: March 17, 2023.  Mr. Emdadi and I explained further to Mr. Zenger why Connectify's products and the methods of using those products do not infringe any claim of the Patent-in-Suit.

8.      To date, Mr. Zenger has not substantively responded to the document.  Moreover, Mr. Zenger declined my invitation to re-confer about the analysis reflected in that document.

9.      Attached to this Declaration as **Exhibit B** is a true and correct copy of a letter from me to Mr. Zenger dated July 12, 2023, providing notice under Fed. R. Civ. P. 11(c)(2), describing the specific conduct that violates Rule 11(b), and requesting the prompt withdrawal of Bounts' patent infringement claims.  To date, Bounts has not withdrawn its claims, nor have I received a reply to my letter.

10.      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: August 3, 2023

Kevin R. Casey

<u>EXHIBIT A</u>

**CONFIDENTIAL INFORMATION**

ANALYSIS OF US 9,258,309 B2

Independent Claims 1, 13 and 19.

Claim 13 requires passing information between two sub-networks and is an apparatus with an additional feature (beyond claim 1) of a "<u>data store</u>" storing a "<u>driver</u>" which stores all sorts of information (routing table 1, routing table 2, network address 1, network address 2) and is less relevant and more narrowing than claim 1 discussed below.

Claim 19 requires a local area network with first and second sub-networks of the same type, a plurality of devices, etc., and is less relevant and more narrowing than claim 1 discussed below.

Claim 1 recites:

1. A method of operating a single network adapter, comprising **a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network**, the method comprising:

setting up **a first network address and routing table in the network interface card or module for use in the first sub-network**;

setting up **a second network address and routing table in the network interface card or module for use in the second sub-network**;

using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, **using the network addresses and routing tables**,

wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and

wherein the step of receiving data comprises **receiving a request from <u>a user</u> via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway**.

Highlighted above are the many limitations recited in claim 1 that are not met by any Connectify product or method.  More specifically:

1) Connectify products and methods do not use **<u>two routing tables</u>** in a single network interface card NIC.  No Connectify products or methods put any routing table in a NIC.
    a. Prosecution history of 9,258,309 is very specific about the need for two routing tables, the prosecution history states how no reference cited uses two routing tables.
        i. See page 10 of Response in response to Office Action dated January 27, 2015

            "Taking one specific example, none of Luo, Know or Wu...teach..."setting up a first and second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-

network. **Luo contains no teaching or suggestion of a single network interface card or module, let alone such a card or module with two network addresses and routing tables** and in communication with **a first and second sub-network** in the manner required by the claims. With regard to Knox, the paragraph highlighted by the Examiner (p.2, para 34) states merely that 'the mobile device 50 maintains a record of the address routing table...', which **refers only to a single routing table and is silent as to where it is stored.** Wu does not appear to make any reference at all to a network address and routing table, **let alone to two such tables stored in a single network interface card or module**."

"Additionally Luo fails to teach or suggest...using an aforesaid single network interface card or module to receive data for one sub-network and **re-transmit the data** to the other sub-network **using the network address and routing tables**, **receiving a request from a user**...verifying the user's access rights..."

2) No Connectify products or methods establish two subnetworks by setting up first and second network address **in** a single network interface card, this is a requirement for all the claims 1, 13 and 19
   a. Discussion on column 7, lines 9-19: subnetting required to create two sub-networks with different IP address allocations.

3) Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations):
   a. the IP controller (hotspot router)
   b. a device on the network (could send a packet from one device to another)
   c. outside the network (**does not require a second routing/translation table**)
      i. A remote third party device would route the packet to its destination via whatever IP translation and identification process is available on such devices. This external networking routing (Internet) is not part of another/second routing table needed or used by the hotspot router.

4) The final claim limitations require interaction with a **"user."** No Connectify products or methods meet these limitations; the products and methods are fully automated.


Finally, all claims of the '309 patent are invalid under Section 101 of the Patent Act. They are also likely invalid based on prior art.

<u>EXHIBIT B</u>



Stradley Ronon Stevens & Young, LLP

Great Valley Corporate Center

30 Valley Stream Parkway

Malvern, PA 19355

Telephone  610.640.5800

Fax  610.640.1965

www.stradley.com

Kevin R. Casey
kcasey@stradley.com
610.640.5813

July 12, 2023

**<u>VIA Electronic Mail & Overnight Mail</u>**

Todd E. Zenger, Esq.
Duren IP
610 E. South Temple Street, Suite 300
Salt Lake City, Utah 84102
tzenger@durenip.com

<div style="margin-left: 2em;">

Re:    **Bounts Technologies Ltd. v. Connectify, Inc., and Does 1-100,
Case No. 2:23-cv-890 (E.D. Pa.) (asserting infringement of
U.S. Patent 9,258,309 (the '309 Patent or the Patent-in-Suit))**

</div>

Dear Todd:

Pursuant to Fed. R. Civ. P. 11, we write to request the prompt withdrawal of Bounts' patent infringement claims in view of the document titled "ANALYSIS OF US 9,258,309 B2" that was sent to you on March 17, 2023 (the "Analysis"), and our subsequent discussion.  (We note that you have never substantively responded to the Analysis and declined our invitation to re-confer.)  As explained further below, the Analysis confirms that Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law.  *See* Fed. R. Civ. P. 11(b)(2).  If Bounts refuses to withdraw the claims, we can only conclude that it does so for an improper purpose divorced from the objective merits of the claims.  *See* Fed. R. Civ. P. 11(b)(1).  We further strongly suspect that Bounts' claims are not based upon "an inquiry reasonable under the circumstances" as required by Rule 11(b).

Still further, Rule 11(b)(3) requires that the factual contentions of a complaint have evidentiary support.  Paragraph 9 of the complaint states: "Bounts sells and offers for sale devices and methods for operating a wireless access point for providing access to a network throughout the United States, including in the state of Pennsylvania."  On information and belief, Bounts does not sell any products.  Bounts is a United Kingdom "micro entity," whose balance sheet suggests that their only activity last year was paying a single 450 pound

Philadelphia, PA • Malvern, PA • Cherry Hill, NJ • Wilmington, DE • Washington, DC • New York, NY • Chicago, IL

A Pennsylvania Limited Liability Partnership

MERITAS LAW FIRMS WORLDWIDE

bill that came due.  See Bounts tax documents at https://find-and-update.company-information.service.gov.uk/company/08758998/filing-history.

     Bounts accuses Connectify of direct patent infringement, induced patent infringement, and willful patent infringement.  Connectify's Analysis and our discussion make abundantly clear that the accused Connectify Hotspot product and related methods cannot be a direct infringement of the claims of the asserted patent, either literally or under the doctrine of equivalents.  Absent direct infringement, induced infringement cannot exist.  Finally, there is absolutely no evidence that infringement was willful even were infringement arguably to exist.  In addition, all claims of the '309 Patent are invalid under Section 101 of the Patent Act, and no liability for infringement can lie if the patent is invalid.  Accordingly, it is readily apparent that Bounts' claims are without basis.

    I.     Direct Infringement

     The Patent-in-Suit issued on February 9, 2016, and is titled "Method And System For Operating A Wireless Access Point For Providing Access To A Network."  The Patent-in-Suit generally concerns a method for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus.  The Patent-in-Suit allegedly addresses the problem of connecting a wireless enabled device to a network via a wireless local area network.  (A wireless access point for providing access to the Internet is commonly known as a "hotspot.")

     According to the Patent-in-Suit, this problem was addressed by International Patent Application Publication No. WO2006/021784.  The prior art system teaches two ports on a wireless access point controller of a wireless access point, each point having its own Internet Protocol (IP) address.  The Patent-in-Suit criticizes the solution of the prior art, explaining that a disadvantage of this arrangement is that each port requires a network adaptor, such as a network card.  Because commonly available personal computers and laptops are not conventionally provided with two network adaptors, the requirements for two network adaptors is an impediment to commissioning of conventional wireless access points as disclosed by the prior art.  Moreover, in such prior art hotspot arrangements, it is necessary to have a separate router (for internet access) such as a modem and a wireless access point.

     The Patent-in-Suit describes the claimed invention as improving the system and method taught by WO2006/021784, allowing the use of a standard wireless router to provide a hotspot for guest access.  More specifically, a method is described in the Patent-in-Suit for operating a single network adapter for use on two different sub-networks of the same type, and a corresponding apparatus.  The method comprises setting up a first network address and routing table in the network adapter for use in the first sub-network; setting up a second network address and routing table in the network adapter for use in the second sub-network; receiving data for one of the first and second sub networks, and re-transmitting the data to the other of the first and second sub-network, using the network addresses and routing tables.  More specifically, at column 7, lines 9-19, the '309 Patent teaches that subnetting is required to create two sub-networks with different IP address allocations:

        The hotspot controller 105 is configured to connect to two separate sub-networks, using a single network interface card (NIC). The first of these sub-networks is for traffic between the guest user's computers 119, 121, 123 on the

wireless network and the hotspot controller 105. The second sub-network is
between the hotspot controller 105 and the internet 113. For example, the first
sub-network may have IP addresses of the form 10.0.1.x, and the second sub-
network may have IP addresses of the form 10.0.2.x. This division into two
sub-networks is what allows the hotspot controller 105 to control the guest
access to the internet.

The Patent-in-Suit resulted from Application No. 14/249,174 filed on April 9, 2014.
In an Office Action dated January 27, 2015, the Patent Examiner rejected all of the claims in
the application in light of the following prior art references: U.S. Patent No. 7,469,294 issued
to Luo; U.S. Patent Application Publication No. 2007/0225019 filed by Knox; U.S. Patent
Application Publication No. 2008/0069065 filed by Wu; and various secondary references.
The Patent Examiner determined that all of the claims would have been obvious to one of
ordinary skill in the art at the time the invention was made.  On July 27, 2015, in response to
the Office Action, the applicant argued that none of the Luo, Knox, or Wu prior art
references suggest setting up a first and a second network address and routing table in a
single interface card or module operable to communicate with a corresponding first and
second sub-network.  On page 10 of that response, the applicant was very specific about the
need for two network addresses and not one routing table but "two such tables stored in a
single network interface card or module" in communication with a first and second sub-
network of a single network interface card or module, distinguishing the prior art references
on the basis that no reference teaches or suggests those characteristics (underlined emphases
added):

> Taking one specific example, none of Luo, Knox or Wu . . . teach . . .
> setting up a first and second network address and routing table in a single
> interface card or module operable to communicate with a corresponding first
> and second sub-network. <u>Luo contains no teaching or suggestion of a single
> network interface card or module, let alone such a card or module with two
> network addresses and routing tables and in communication with a first and
> second sub-network in the manner required by the claims.</u> With regard to
> <u>Knox</u>, the paragraph highlighted by the Examiner (p.2, para 34) states merely
> that 'the mobile device 50 maintains a record of the address routing table . . .',
> which <u>refers only to a single routing table and is silent as to where it is stored</u>.
> <u>Wu</u> does not appear to make any reference at all to a network address and
> routing table, <u>let alone to two such tables stored in a single network interface
> card or module</u>.

> Additionally Luo fails to teach or suggest . . . using an aforesaid single
> network interface card or module to receive data for one sub-network and <u>re-
> transmit the data</u> to the other sub-network <u>using the network address and
> routing tables, receiving a request from a user</u> . . . verifying the user's access
> rights . . . .

The Patent Examiner then allowed the application.

The prosecution history shows that the applicant was unequivocal in taking the
position that the claimed invention is patentable over the prior art because the claimed card
or module has two network addresses and two routing tables.  According to the U.S. Court of

Appeals for the Federal Circuit, which hears all appeals in patent infringement suits, "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (reversing district court's infringement decision). Thus, the prosecution history shows that the applicant gave up an interpretation of the claim limitations that could include a method or an apparatus with a single network address or a single routing table in a single network interface card or module.

All patents conclude with a claim or set of claims particularly pointing out and distinctly claiming the subject matter which the patentee regards as the invention. The claims define the invention for the purpose of determining infringement. A claim will not cover or "read on" any product or method accused of infringement unless that product or method contains all of the limitations present in the claim (or an equivalent of a limitation within the meaning of the doctrine of equivalents). Thus, each limitation present in a claim constitutes a narrowing of the scope of that claim. A number of sources, including the specification of the patent, the prosecution history of the patent before the U.S. Patent and Trademark Office ("PTO"), and the prior art, help to give the claims their meaning and, hence, their scope.

Thus, the first step in a non-infringement analysis is to properly interpret the claims of the subject patent. After the limitations of the claims are interpreted, it is necessary to apply the second step of a non-infringement analysis and determine whether the claims cover the alleged infringer's product or method. If all of a claim's limitations are found literally, then there usually is "literal" infringement and the infringement analysis ends. The doctrine of equivalents allows a court to find infringement when an infringer steals the heart of an invention but avoids the literal language of a claim by making a minor change.

The '309 Patent recites three independent claims: claims 1, 13, and 19. Claim 13 requires passing information between two sub-networks and is an apparatus with an additional feature (beyond claim 1) of a "data store" storing a "driver" which stores all sorts of information (routing table 1, routing table 2, network address 1, network address 2) and is less relevant and more narrowing than claim 1 discussed below. Claim 19 requires a local area network with first and second sub-networks of the same type, a plurality of devices, etc., and is less relevant and more narrowing than claim 1 discussed below. Therefore, our analysis focuses on claim 1 (which is the only claim specifically asserted in Bounts' complaint). Claim 1 recites (underlined and bold emphases added):

> 1. A method of operating a single network adapter, comprising <u>a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network</u>, the method comprising:
>
> <u>setting up a first network address and routing table</u> **in** <u>the network interface card or module for use in the first sub-network</u>;
>
> <u>setting up a second network address and routing table</u> **in** <u>the network interface card or module for use in the second sub-network</u>;

using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, <u>using the network addresses and routing tables,</u>

wherein the first sub-network includes a network gateway and the network adapter is configured to control access from the second sub-network to the network gateway, and

<u>wherein the step of receiving data comprises receiving a request from a user via the second sub-network to access the gateway on the first sub-network, verifying the user's access rights, and allowing the user to access the gateway if and only if the user is entitled to access the gateway.</u>

Highlighted above are the many limitations recited in claim 1 that are not met by any Connectify product or method. Literal infringement requires that the accused product or method embody <u>each</u> limitation of the asserted claim. *Southwall Tech., Inc. v. Cardinal I.G. Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). The absence of <u>any</u> limitation of the asserted claim defeats literal infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

First, Connectify products and methods do not use <u>two routing tables</u> in a single network interface card or module. No Connectify products or methods put <u>any</u> routing table in a network interface card or module. Second, no Connectify products or methods establish two subnetworks by setting up first and second network addresses <u>in</u> a single network interface card (which is a requirement for each of the independent claims 1, 13, and 19). Third, Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations): (i) the IP controller (hotspot router): (ii) a device on the network (could send a packet from one device to another); or (iii) a remote third party device that would route the packet to its destination via whatever IP translation and identification process is available on such devices (this external networking routing (internet) is not part of another/second routing table needed or used by the hotspot router). Finally, all of the claims require interaction with a "user." No Connectify products or methods meet that requirement or limitation; the products and methods are fully automated.

Although the accused Connectify Hotspot product and related methods avoid infringement if they fail to meet any one limitation recited in the claims of the '309 Patent, they fail to meet many of the recited limitations. Focus on the limitations that require two, separate network addresses and routing tables, each for use in a separate sub-network, in a single network interface card or module. The express language of the claims recite these limitations. And the structure of the claims could not be any more clear that there is a first network address and routing table in the network interface card or module for use in the first sub-network, and a second network address and routing table in the network interface card or module for use in the second sub-network.

The claimed concept of using two, separate sub-networks each having their own addresses and routing tables in a single network interface card or module is emphasized repeatedly in the patent specification. See, for example, column 7, lines 9-19, of the

specification quoted above and the Abstract and Summary of Invention (both of which characterize the invention as a method for operating a single network adapter for use on two different sub-networks of the same type and a corresponding apparatus). Likewise, during prosecution of the application that issued as the '309 Patent, it is clear that the Examiner allowed the patent after the applicant distinguished the claims from the prior art on the ground that no cited prior art reference teaches or suggest two network addresses and routing tables in communication with a first and second sub-network of a single network interface card or module.

Any theory concluding that the accused Connectify Hotspot product and related methods infringe is not colorable in view of the express language of the claims, the patent specification, and the prosecution history. Simply put, no Connectify products or methods put any routing table (let alone two routing tables) in a network interface card or module. Therefore, any theory of infringement must defy the express language of the claims and cannot satisfy Bounts' Rule 11 obligation. Such a theory of infringement would read out the claim language requirements that two, separate sub-networks each have their own addresses and routing tables in a single network interface card or module. Indeed, such a theory would remove the basis upon which the PTO issued the '309 Patent. The existing law of claim construction does not warrant a contrary claim construction.

To be clear, there is no good faith debate regarding a claim construction issue. Connectify's interpretation of the claim limitations is uniformly supported by the claim language, the patent specification, and the prosecution history. Therefore, any theory of patent infringement must be a blatant effort by Bounts to rewrite a claim after the fact to attempt to cover a device and related methods that do not come within any plausible reading of the claims as issued.

Furthermore, the existing law of the doctrine of equivalents does not warrant any theory that the claimed methods or apparatus could be equivalent to the accused Connectify Hotspot product and related methods, legally or factually. Any argument to the contrary is not colorable in view of the claims, the patent specification, the prosecution history, and Connectify's Analysis and our subsequent discussion. Even assuming that the doctrine of equivalents is applicable, which it is not, in view of such countervailing doctrines as claim vitiation and prosecution history estoppel, the idea that the differences are insubstantial is not credible. Because Connectify products and methods do not (i) use two routing tables in a single network interface card or module, (ii) put any routing table in a network interface card or module, (iii) establish two subnetworks by setting up first and second network addresses in a single network interface card, or (iv) require any interaction with a user, they are substantially different from the claimed methods and apparatus.

II.    Induced Infringement

Under 35 U.S.C. § 271(b), "Whoever actively induces infringement of a patent shall be liable as an infringer." The five elements of a claim of induced infringement are: "(1) with knowledge of or willful blindness to the existence of the patent-in-suit; (2) the defendant engaged in affirmative acts to induce (e.g., by persuading, leading, or influencing) a third party to perform acts that; (3) the defendant knew constituted infringement of the patent-in-suit (or was willfully blind to that fact); (4) with the specific intent to cause such infringement; and which (5) resulted in the third party directly infringing the patent-at-issue." *Bonutti Skeletal Innovations,*

*LLC v. Globus Medical Inc.*, 2015 WL 3755223 at *5 (E.D. Pa. 2015) (granting motion to dismiss claims of induced and willful infringement); *see also In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016).

Bounts has no evidence supporting any of the five elements. First, "[i]t is axiomatic that '[t]here can be no inducement . . . [of] infringement without an underlying act of direct infringement.'" *In re Bill of Lading*, 681 F.3d at 1333 (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted)). In this case, the complaint does not allege and completely fails to plead facts sufficient to plausibly show that a third party directly infringes the Patent-in-Suit.

Second, Connectify had no knowledge that the allegedly induced acts constitute patent infringement or the specific intent to cause the alleged direct infringement. "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Moreover, "the intent requirement for inducement requires more than just the intent to cause the acts that produce direct infringement, . . . the inducer must have an affirmative intent to cause direct infringement. . . . To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part); *Compound Photonics, LTD v. Sony Corp.*, 2013 WL 4826585 at p. 5 (E.D. Tex. 2013), report and recommendation adopted, No. 6:11-cv-00552 (E.D. Texas Jul. 18, 2013) ("[T]he knowledge requirement for inducement refers to the inducer's knowledge of the induced third party's infringing acts, not knowledge of an inducer's own inducing conduct"). As in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223, Bounts' inducement claim must fail for at least this reason.

Connectify did not even remotely have the intent necessary for an induced infringement claim. Indeed, the complaint does not allege and completely fails to plead facts sufficient to plausibly show that Connectify had knowledge of the Patent-in-Suit before the complaint was filed. Nor could the complaint truthfully so allege because, in fact, Connectify was completely unaware of either the Patent-in-Suit or Bounts' allegations of infringement before the lawsuit was filed. Nor has Bounts adequately alleged (nor could it) that Connectify knew any third party was engaged in activity that constituted a direct infringement. These facts were dispositive in *Progme Corp. v. Comcast Cable Communications LLC*, 2017 WL 5070723 at *8 (E.D. Pa. 2017), and should be dispositive in this case.

Third, Connectify has not taken any action to induce direct infringement by a third party. "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med.*, 471 F.3d at 1306; *Power Integrations*, 843 F.3d at 1332 ("'[T]o prevail under a theory of indirect infringement, [plaintiff] must first prove that the defendants' actions led to direct infringement of the [patent-in-suit]'") (citation omitted). In this case, the complaint does not allege (nor could it) and completely fails to plead facts regarding Connectify's specific intent. Bounts cites no facts that lead to the plausible inference that Connectify intended for a third party to infringe the claims of the Patent-in-Suit. For this reason, too, and as in *Progme Corp.*, 2017 WL 5070723 at *9, and in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223 at *9, Bounts' inducement claim must fail.

III.    Willful Infringement

Bounts seeks enhanced damages for willful infringement under 35 U.S.C. § 284.  Under Section 284, a court may "increase the damages up to three times the amount found or assessed." Willful infringement is reserved for "egregious infringement behavior" that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or -- indeed -- characteristic of a pirate."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016).  The Federal Circuit has clarified that "it is the circumstances [of the case] that transform simple 'intentional or knowing' infringement into egregious, sanctionable behavior, and that makes all the difference." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019).  Therefore, to succeed on its willful infringement claim, Bounts must allege that Connectify engaged in egregious misconduct, which is well beyond an allegation of knowing and continued infringement.  A willful infringement allegation must be supported by facts that the accused infringer both: (1) knew about the asserted patent before the lawsuit was filed; and (2) acted in a subjectively reckless manner concerning potential infringement which is beyond an allegation of knowing and continued infringement.  These facts do not exist here.

In fact, Connectify was completely unaware of the Patent-in-Suit before the lawsuit was filed and had no reason to believe the Patent-in-Suit existed.  Connectify has sold the accused product, "Connectify Hotspot," for fourteen years and the Patent-in-Suit issued in 2016.  The seven years of sales by Connectify without notice from Bounts of the Patent-in-Suit certainly justified Connectify in subjectively believing there was a high probability the Patent-in-Suit did NOT exist.

Nor has Connectify acted in a subjectively reckless manner concerning potential infringement.  In fact, immediately after learning of the lawsuit, Connectify analyzed the claims of the Patent-in-Suit, determined that its products and methods did not infringe, and explained its analysis and determination to counsel for Bounts.  Such conduct is the opposite of acting with egregious intent or recklessness.

Indeed, Bounts' willful infringement allegations are substantially thinner than other willful infringement allegations that have been dismissed in the U.S. District Court for the Eastern District of Pennsylvania as insufficient.  For example, in *Bonutti Skeletal Innovations, LLC*, 2015 WL 3755223 at *11-12, the court dismissed Bonutti's willful infringement claims even though Globus had listed Bonutti's asserted patent in connection with the prosecution of its own patent application.  Accordingly, Bounts' willful infringement claims are legally insufficient.

On March 17, 2023, Connectify put Bounts on notice of the flaws in its direct infringement claims.  Bounts acquiesced until serving this lawsuit for what appears to be an improper business motivation divorced from any objective assessment of the merits.  There is no credible basis to maintain the patent infringement claims.  Particularly given the lack of commercial activity of Bounts, the improper motive would be readily apparent if Bounts were to maintain these expensive but frivolous claims.

We also strongly suspect that Bounts' claims are not based upon "an inquiry reasonable under the circumstances" as required by Fed. R. Civ. P. 11(b).  The decisions of the Federal Circuit require, under Rule 11, that a party reverse engineer, or at least examine closely, an accused product before filing a patent infringement complaint.  Failure to make

appropriate investigation before filing a patent infringement suit may also trigger 35 U.S.C. § 285 (attorney fees may be awarded in "exceptional cases"). Note that the 1993 amendments to Rule 11 rejected the "paper-as-a-whole" approach; the current version of the rule makes clear that sanctions may be based on a single invalid legal or factual theory (e.g., assertion of one patent claim) even if other asserted theories are valid (e.g., assertion of other claims). *See Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066 (Fed. Cir. 2002) (citing G. Vairo, "Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures," 4-117 (2d ed. 1990 & Supp. 1995)).

In *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000), the Federal Circuit affirmed the district court's decision to impose a $97,825 sanction on attorneys representing a declaratory judgment defendant, based on lack of reasonable inquiry before filing infringement counterclaims. The defendant merely reviewed the plaintiff's advertising and statements made to customers but never had physical access to the accused machines. The Federal Circuit stated:

> Before filing counterclaims of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11. . . . In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

*Id.* at 986.

In summary, Bounts cannot maintain its patent infringement claims under existing law or any non-frivolous argument for new law. Accordingly, we request that Bounts withdraw its patent infringement claims with prejudice by <u>August 2, 2023</u>. If Bounts refuses to withdraw the patent infringement claims, we will initiate Rule 11 proceedings and seek all appropriate remedies, including the recovery of our fees to bring the Rule 11 motion as well as costs and fees to defend the patent infringement claims in the interim.

Sincerely,

Kevin R. Casey

Kevin R. Casey

KRC:ml

cc: Patrick Kingsley, Esq.; Samantha Kats, Esq.; and Ryan E. Borneman, Esq. (via e-mail only)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOUNTS TECHNOLOGIES LTD., | : | |
| Plaintiff, | : | CASE NO. 2:23-cv-890 |
| | : | |
| v. | : | Judge Mia Roberts Perez |
| | : | |
| CONNECTIFY, INC. AND DOES 1-100, | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF KAMRAN EMDADI, ESQ. IN SUPPORT OF
CONNECTIFY'S OPENING BRIEF IN SUPPORT OF ITS MOTION
FOR SANCTIONS UNDER FEDERAL RULE OF CIVIL PROCEDURE 11**

I, Kamran Emdadi, do declare and state as follows:

1. I am a patent attorney working with Connectify, Inc., a Defendant in this litigation.

2. I have personal knowledge of the facts stated in this Declaration.

3. I submit this Declaration in support of Connectify's Opening Brief in Support of its Motion for Sanctions Under Federal Rule of Civil Procedure 11.

4. Immediately after Bounts filed this lawsuit on March 8, 2023, I studied Bounts' U.S. Patent No. 9,258,309 (the "Patent-in-Suit") and analyzed whether any of Connectify's products or the methods of using those products infringe any claim of the Patent-in-Suit. I determined that Connectify's products and methods do not infringe.

5. I worked with Connectify's outside counsel, Kevin Casey of Stradley, Ronon, Stevens & Young, LLP, to draft a document titled "ANALYSIS OF US 9,258,309 B2." That document is attached as **Exhibit A** to the Declaration of Kevin Casey in support of Connectify's Motion for Rule 11 Sanctions. Mr. Casey sent that document to Todd E. Zenger, Esq., counsel for

Bounts, on March 17, 2023. The analysis reflected in that document confirms that Bounts' patent infringement claims are not warranted under existing law or a non-frivolous argument for new law.

6.    After Mr. Casey sent the document to Mr. Zenger, Mr. Casey and I conferred with Mr. Zenger on the same day: March 17, 2023. Mr. Casey and I explained further to Mr. Zenger why Connectify's products and the methods of using those products do not infringe any claim of the Patent-in-Suit.

7.    To date, Mr. Zenger has not substantively responded to either the document or our explanation.

8.    Connectify products and methods do not use two routing tables in a single network interface card or module. No Connectify products or methods put any routing table in a network interface card or module.

9.    No Connectify products or methods establish two subnetworks by setting up first and second network addresses in a single network interface card.

10.    Connectify products or methods may establish one translation table that can interpret a packet destination received for one of three possibilities (destinations): (i) the IP controller (hotspot router): (ii) a device on the network (could send a packet from one device to another); or (iii) a remote third party device that would route the packet to its destination via whatever IP translation and identification process is available on such devices (this external networking routing (internet) is not part of another/second routing table needed or used by the hotspot router).

11.    No Connectify products or methods require interaction with a user; the products and methods are fully automated.

12.     Connectify was completely unaware of either the Patent-in-Suit or Bounts' allegations of infringement before Bounts filed the lawsuit on March 8, 2023.

13.     Connectify does not know of any third party that has engaged in activity that constitutes a direct infringement of any claim of the Patent-in-Suit.  Nor has Connectify taken any action to induce direct infringement by a third party.

14.     Connectify has sold the product that Bounts accuses of infringement, called the "Connectify Hotspot," for fourteen years and the Patent-in-Suit issued in 2016.

15.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated: August 1, 2023

_____
Kamran Emdadi