**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **BOUNTS TECHNOLOGIES LTD.,** | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | |
| **v.** | : | |
| | : | |
| **CONNECTIFY, INC. and DOES 1–100,** | : | **NO. 2:23-cv-890-MRP** |
| | : | |
| Defendants. | : | |

**Perez, J.**                                                               **April 30, 2025**

**<u>MEMORANDUM</u>**

Plaintiff Bounts Technologies, Ltd. ("Plaintiff") brings this action against Defendants Connectify, Inc. ("Defendant" or "Connectify"), and Does 1–100, believed to be distributors, resellers, or end users of Connectify's network hotspot products. Plaintiff alleges Defendant has directly infringed and induced third parties to infringe upon a patent in which Plaintiff owns all rights. Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint. For the reasons set forth below, the motion is denied.

**I.      BACKGROUND**

Plaintiff is the owner of all rights in U.S. Patent No. 9,258,309, titled "Method and System for Operating a Wireless Access Point for Providing Access to a Network" ("'309 Patent"). ECF No. 26 ¶ 6; ECF No. 26-1 at 2. The '309 Patent "relates to a method of operating a wireless access point," such as a computer linked to a wireless router, to provide other wireless-enabled devices with "access to a network," such as the Internet—commonly known as a "hotspot." ECF No. 26-1 at 1:7–10; *see also id.* at 4:16–23. The '309 Patent purports to improve "prior art hotspot arrangements," which require "a separate router . . . and a wireless access point," by "allowing the use of a standard wireless router to provide a hotspot for guest access," *id.* at 2:4–9:



*Id.* at 3–4.

Figure 1 illustrates a prior art "system for connecting a wireless enabled device to a network via a wireless local area network." *Id.* at 1:14–15. The wireless access point (3) comprises the wireless access point controller (5)—*e.g.*, a computer—and the base station (7)—*e.g.*, a wireless router. *Id.* at 1:19–22. The wireless access point controller (5) controls the connection of wireless enabled devices (9) to the network (13)—*e.g.*, the Internet. *Id.* at 1:21–22. It (5) connects to the modem (11) at its first port (6a) and to the base station (7) at its second port (6b). *Id.* at 1:23–25. Thus, using the first port (6a), the wireless access point controller (5) is connected via a modem (11) to the network (13) and the server (15), comprising the server processor (16) and storage (17). *Id.* at 1:16–19, 31–32. The storage means (17) stores information about wireless access points (3)

and subscription data associated with users of wireless enabled devices (9). *Id.* at 1:34–37. Using

the second port (6b), the wireless access point controller (5) is connected via the base station (7)

to one or more wireless enabled devices (9). *Id.* at 1:19–21.

In this configuration, each port (6a, 6b) has its own Internet Protocol ("IP") address. *Id.* at

1:60–63.

> A disadvantage of this arrangement is that each port 6a, 6b requires a network
> adaptor, such as a network card. As commonly available personal computers and
> laptops are not conventionally provided with two network adaptors the
> requirements [*sic*] for two network adaptors is an impediment to commissioning of
> conventional wireless access points 3 . . . . [I]n such prior art hotspot arrangements,
> it is necessary to have a separate router (for internet access) such as a modem 11
> and a wireless access point 3.

*Id.* at 1:63–2:6.

The connections in Figure 2 similarly run through a wireless access point controller

(105)—*e.g.*, a computer—and a wireless router (110). *Id.* at 4:15–16. As in Figure 1, the wireless

access point controller (105) controls wireless enabled devices' (109) access to the network

(113)—*e.g.*, the Internet. *Id.* at 4:23–28. But it (105) connects to the wireless router (110) at its

only port (106c). *Id.* at 4:64–66. The wireless router (110) itself comprises a modem (111) and a

wireless access point (112). *Id.* at 4:16–18. Thus, using the only port (106c), the wireless access

point controller is connected via modem (111) to the network (113) and the server (115),

comprising the server processor (116) and storage (117). The storage means (117) contains

information relating to the operation of the wireless router (110), wireless access points (112), and

subscription data associated with users of wireless enabled devices (109). *Id.* at 5:1–4. Also using

port 106(c), the wireless access point controller (105) is connected via modem (111) to the wireless

access point (112) and, ultimately, wireless enabled devices (109). *Id.* at 5:38–41. Because the

claimed method involves a single port (6c), only one network adaptor is necessary to receive and

transmit data between the two sub-networks. *Id.* at 2:6–9, 2:13–15.

When a wireless enabled device (109) is in range of the wireless router (110), it (109) can connect to the wireless access point (112). *Id.* at 5:5–9. When a web browser application is run on the wireless enabled device (109), software on the wireless access point controller (105) causes a "login/sign-up page" to be displayed. *Id.* at 5:9–12. If the end user of the wireless enabled device (109) is not subscribed to the network (113), they can register by entering personal information that is transmitted via the wireless router (110) and network (113) to the server (115), and stored on the storage means (117). *Id.* at 5:13–19.

When the registered user of a wireless enabled device (109) logs in, the wireless access point controller (105) authenticates the user with the server (115) by confirming against the subscription information in the server storage (117). *Id.* at 5:27–32. If confirmed, the server (115) authorizes the wireless access point controller (105) to grant the wireless enabled device (109) full access to the network (113). *Id.* at 5:32–34.

Claims 1, 13, and 19 of the '309 Patent are independent. *Id.* at 8:62–11:25. Claim 1 recites:

A method of operating a single network adaptor, comprising a single network interface card or module, to communicate wirelessly with a first sub-network and a second sub-network, the method comprising:

setting up a first network address and routing table in the network interface card or module for use in the first sub-network;

setting up a second network address and routing table in the network interface card or module for use in the second sub-network;

using said single network interface card or module to receive data for one of the first and second sub-networks, and to re-transmit the data to the other of the first and second sub-network, using the network addresses and routing tables,

wherein the first sub-network includes a network gateway and the network adaptor is configured to control access from the second sub-network to the network gateway, and

wherein the step of receiving data comprises receiving a request from a user via the
second sub-network to access the gateway on the first sub-network, verifying the
user's access rights, and allowing the user to access the gateway if and only if the
user is entitled to access the gateway.

*Id.* at 8:63–9:21. "At the time of the '309 invention, a single network card could potentially support

two IP addresses and subnets. However, there was no functionality or need to route traffic between

these two subnets or to verify or authenticate the traffic." ECF No. 42-1 ¶ 9.

Claim 13 recites an apparatus for performing the method recited in Claim 1. *See* ECF No.

26-1 at 10:7–32. Claim 19 recites a method that limits the scope of the sub-networks recited in

Claim 1. *Id.* at 10:63–11:26. Plaintiffs do not dispute Claim 1 is a representative claim. *See Content*

*Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir.

2014).

Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Second Amended

Complaint (ECF No. 40). Defendant contends Plaintiff fails to state a claim for direct or induced

patent infringement because the '309 Patent is invalid under 35 U.S.C. § 101. *See generally* ECF

No. 40-1. Plaintiff counters that dismissal is inappropriate because Defendant misconstrues facts

concerning the prior art and therefore misapprehends the claims of the '309 Patent in the first place.

*See generally* ECF No. 42.

## II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain enough factual matter to state a

plausible claim for relief, though it need not show a probability of success at this stage. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Courts

accept the complaint's facts as true and draw reasonable inferences in the plaintiff's favor. *In re*

*Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000).

Patent "[e]ligibility is ultimately a question of law that may be based on underlying factual

findings." *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1377 (Fed. Cir. 2024) (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018)). "[I]t may be resolved on a Rule 12(b)(6) motion 'where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law.'" *Id.* at 1377–78 (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018)).

## III.    DISCUSSION

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor," 35 U.S.C. § 101, subject to certain judicially-recognized exceptions. *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208, 216 (2014). To determine whether a patent claims excepted subject matter, a court must assess (1) whether "the claims as a whole . . . are 'directed to' patent-ineligible subject matter," *AI Visualize*, 97 F.4th at 1378 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)); "and if so, (2) whether the elements of the claim, considered 'both individually and as an ordered combination,' add enough to 'transform the nature of the claim into a patent-eligible application.'" *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325 (Fed. Cir. 2017) (quoting *Alice*, 573 U.S. at 217). Where, as here, claims are challenged as abstract ideas, courts "typically refer to step one as the 'abstract idea' step and step two as the 'inventive concept' step." *Id.* (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)).

While "claim construction is not an inviolable prerequisite to a validity determination under § 101" at the pleading stage, "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter[.]" *Content Extraction*, 776 F.3d at 1349 (citing *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 714–15 (Fed. Cir. 2014); *Bancorp Svcs., LLC v. Sun Life Assur. Co. of Canada (U.S)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012)).

Here, the Parties dispute the scope and content of the prior art, and therefore the alleged invention of the representative claim. *See, e.g.*, ECF No. 42 at 9–10. Accordingly, the Court will turn first to construing Claim 1.

### A. Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he words of a claim 'are generally given their ordinary and customary meaning'" as interpreted by "a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *id.* at 1313 (collecting cases). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (citing *Brown v. 3M,* 265 F.3d 1349, 1352 (Fed. Cir. 2001)). Otherwise, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean'"—*i.e.*, "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence[.]'" *Id.* (quoting *Innova,* 381 F.3d at 1116).

"The prosecution history, which" is "part of the 'intrinsic evidence,' consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." *Id.* at 1317 (citing *Autogiro Co. of Am. v. United States,* 384 F.2d 391, 399 (Ct. Cl. 1967)). "[E]xtrinsic evidence . . . 'consists of all evidence external to the patent and prosecution history, including . . . inventor testimony[.]'" *Id.* (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517

U.S. 370 (1996)). "[W]hile extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004)).

Defendant endorses interpreting Claim 1 as a "*Jepson* claim," narrowing the invention itself to the two "wherein" clauses. ECF No. 40-1 at 6; *see supra* Part I (recitation of Claim 1). A *Jepson* claim must contain, *inter alia*, "[a] preamble comprising a general description of all the elements or steps of the claimed combination which are conventional or known" and "[a] phrase such as 'wherein the improvement comprises[.]'" 37 C.F.R. § 1.75(e). "Drafting a claim in *Jepson* format . . . is taken as an implied admission that the subject matter of the preamble is the prior art work of another." U.S. Manual of Patent Examining Procedure ("MPEP") § 2129 (citing *In re Fout*, 675 F.2d 297, 301 (C.C.P.A. 1982)).

This Court finds that Claim 1 is not a *Jepson* claim. The claim itself does not include a phrase specifically emphasizing a specific "improvement" over admitted prior art; its use of the descriptor "wherein," on its own, is insufficient. Moreover, the PTO withdrew its initial rejection of the patent application after the applicant emphasized that no prior art taught or suggested:

- "setting up a first and second network address and routing table in a single interface card or module operable to communicate with a corresponding first and second sub-network";

- "using . . . aforesaid single network interface card or module to receive data for one sub-network and re-transmit the data to the other sub-network using the network address and routing tables";

- "receiving a request from a user via the second sub-network to access a gateway on

the first sub-network";

- "verifying the user's access rights"; and

- "allowing the user to access the gateway if and only if the user is entitled to access the gateway."

ECF No. 11-6, Ex. 3 at 10. Construing all allegations and inferences in Plaintiff's favor, the Court rejects Defendant's narrow reading of Claim 1.

### B. Patent Eligibility

#### 1. Abstract Idea

"[C]laims are considered in their entirety to ascertain whether their character as a whole is directed to" an abstract idea. *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021) (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016)). There is no "definitive rule to determine what constitutes an 'abstract idea' . . . . Rather, both [the Federal Circuit Court of Appeals] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334 (citing *Alice*, 573 U.S. at 221). "In the realm of computer-related technology, . . . patent claims may be non-abstract . . . if the focus of the claimed advance is on an improvement in computer technologies, rather than the mere use of computers." *AI Visualize*, 97 F.4th at 1378 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)).

Accordingly, "[i]n cases involving software innovations," the outcome "often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an abstract idea' for which computers are invoked merely as a tool." *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018), *as am.* (Nov. 20, 2018) (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018)). For

example, in *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, the court considered

whether an invention that "combin[ed] the advantages of the then-known [internet content]

filtering tools while avoiding their drawbacks" was directed to the abstract idea of "filtering

content" or technical improvements over known filtering techniques. 827 F.3d 1341, 1344, 1346

(Fed. Cir. 2016). The court concluded the claims were "directed to filtering content on the

Internet." *Id.* at 1348. While it recognized that "filtering content is an abstract idea" regardless of

whether it takes place "on 'an Internet computer network' or on a generic computer," it could not

disregard the patent owner's contention that the claims were "directed to the more specific

problem" of providing individually customized Internet-content filtering using more secure

methods—*i.e.*, a non-abstract improvement. *Id.* at 1348–49 (quoting *Intell. Ventures I LLC v.*

*Capital One Bank (USA)*, 792 F.3d 1363, 1368 n.2 (Fed. Cir. 2015)).

The '309 Patent similarly "presents a 'close call[] about how to characterize what the

claims are directed to.'" *Id.* at 1349 (quoting *Enfish*, 822 F.3d at 1339). As in *Bascom*, Claim 1

*involves* an abstract idea, but Plaintiff argues it is not necessarily *directed to* that abstract idea as a

whole. *See AI Visualize*, 97 F.4th at 1378 ("The "'directed to' inquiry does more than 'simply ask

whether the claims *involve* a patent-ineligible concept.'" (quoting *Enfish*, 822 F.3d at 1335)

(emphasis in original)).

Defendant argues Claim 1's limitations are "unpatentable as an abstract idea because they

perform activities which are not significantly more than . . . a user requesting access and receiving

verification[.]" ECF No. 40-1 at 10. Defendant is correct that "[c]ollect[ing] and examin[ing] data

to authenticate [a] user's identity" and "providing restricted access to resources" are abstract ideas.

*Universal*, 10 F.4th at 1347, 1352 (quoting *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x

1014, 1016–17 (Fed. Cir. 2017)). But the Court has rejected Defendant's narrow construction of

Claim 1, *see supra* Part III.A, and must "recognize the focus of the claims without characterizing the claims at too high of a level of generality, untethered from the claim language itself." *AI Visualize*, 97 F.4th at 1378 (citing *Enfish*, 822 F.3d at 1337). Accordingly, the Court finds Claim 1 is directed to a method of using a single network interface card to provide access to a network. ECF No. 26-1 at 8:63–66. And Plaintiff argues the use of a single network interface card is an improvement over existing methods of facilitating communication between two sub-networks, because it eliminates the need "to separately install a second network card." ECF No. 42 at 9.

As in *Bascom*, "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea." 827 F.3d at 1349. The Court "therefore defer[s] [its] consideration of the specific claim limitations' narrowing effect for step two." *Id.*

## 2. Inventive Concept

"An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *Id.* (citing *Alice*, 573 U.S. at 223). "Limitations . . . found to qualify as 'significantly more' . . . include: [i]mprovements to the functioning of a computer," "adding a specific limitation other than what is well-understood, routine, conventional activity in the field, or adding unconventional steps that confine the claim to a particular useful application[.]" MPEP § 2106.05 (collecting cases). "[C]laims may exhibit an improvement over conventional computer functionality even if the improvement lacks novelty over the prior art," particularly where they achieve benefits over conventional applications. *Id.* § 2106.05(d) (citing *Enfish*, 822 F.3d 1327; *Microsoft Corp. v. Enfish, LLC*, 662 F. App'x 981 (Fed. Cir. 2016)). A court must assess the claims elements both "individually and as an ordered combination[.]" *AI Visualize*, 97 F.4th at 1379 (quoting *Two-Way Media Ltd. v. Comcast Cable*

*Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017)).

The Court agrees with Defendant that, individually, Claim 1's limitations "recite common network elements and components. . . . In fact, the elements illustrated in Figure 1 (prior art configuration) are the same elements illustrated in Figure 2 (the alleged invention)." ECF No. 40-1 at 13. But "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 827 F.3d at 1350. For example, the *Bascom* court held that while "[f]iltering content on the Internet was already a known concept, . . . the patent describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." *Id.* Analogously, while verifying permission to access resources is a known concept, the '309 Patent describes how using a single network card to facilitate verification improves prior art methods requiring the installation of a separate network card on a standard computer.

*Ancora* is instructive.[1] The patent at issue in that case claimed "[a] method of restricting software operation" to licensed users by storing license-verification information in a specific module of a computer's read-only memory. 908 F.3d at 1345–46. The patent indicated using this module, "rather than other memory in the computer, improve[d] computer security . . . because successfully hacking [the module] . . . [was] much harder than hacking the memory used by the prior art to store license-verification information." *Id.* at 1345. The Federal Circuit explained that "[i]mproving security—here, against a computer's unauthorized use of a program—can be a . . . computer-functionality improvement if done by a specific technique that departs from earlier

---

[1] While the *Ancora* court analyzed whether a specific technological improvement defeated abstractness, its reasoning is relevant to the inventive concept analysis. *See Ancora*, 908 F.3d at 1349 ("We do note, *in accord with our recognition of overlaps between some step one and step two considerations*, that our conclusion that the specific improvement in this case passes muster at step one is indirectly reinforced by some of our holdings under step two." (citing *Elec. Power Grp.*, 830 F.3d at 1353) (emphasis added)); *Enfish*, 822 F.3d at 1335 (explaining improvements in computer-related technology can be analyzed under both the abstract idea and inventive concept steps).

approaches to solve a specific computer problem." *Id.* at 1348 (citing *Finjan*, 879 F.3d at 1304–05). By "mov[ing] a software-verification structure to a . . . location not previously used for this computer-security purpose and alter[ing] how the function is performed," the claim "yielded a tangible technological benefit": reducing hacking exposure. *Id.* at 1350.

As in *Ancora*, the '309 Patent claims a specific technique that departs from earlier approaches to solve a particular technological problem. The technique concerns how access request and authentication data are transmitted between two sub-networks. Rather than requiring two network interface cards, and therefore two routing tables, to direct requests from devices on each sub-network to their proper destinations, Claim 1 teaches the use of a single network interface card with one routing table covering "all sub-network IP addresses or sub-routing table entries." ECF No. 42-1 ¶¶ 6, 7. While "[a]t the time of the '309 invention, a single network card could potentially support two IP addresses and subnets," *id.* ¶ 9, Plaintiff asserts—and at this stage, the Court "lack[s] any basis for disputing," *Ancora*, 908 F.3d at 1349—that individual network cards were not previously used "to route traffic *between* these two subnets or to verify or authenticate the traffic." ECF No. 42-1 ¶ 9 (emphasis added).

This allegedly novel use allows for "a standard wireless router to provide a hotspot for guest access" without the need for "a separate router . . . and a wireless access point." ECF No. 26-1 at 2:4–9. In practical terms, this means any commonly available personal computer or laptop can serve as a hotspot without a separately installed second network card. *See id.* at 1:64–2:9; ECF No. 42 at 9. In sum, Plaintiff has plausibly alleged Claim 1 "is directed to a solution to a computer-functionality problem: an improvement in computer functionality that has 'the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it.'" *Ancora*, 908 F.3d at 1349 (quoting *SAP Am.*, 898 F.3d at 1167). "[A]t the motion to dismiss stage,

'patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6).'" *AI Visualize*, 97 F.4th at 1379 (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–27 (Fed. Cir. 2018)).

## IV.    CONCLUSION

While the claims of the '309 Patent may be directed to the abstract ideas of user authentication and access restriction, Plaintiff has adequately alleged that they recite sufficient elements to transform the ideas into patent-eligible applications. Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint is therefore denied. An appropriate order follows.